**BURGER CHEF SYSTEMS, INC., Appellant,**

v.

**MELFRED COMPANY, Appellee.**

**No. 75–1394.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1975.

Decided Sept. 17, 1976.

* Sitting by Designation.

William C. Raper, Winston-Salem, N.C. (Allan R. Gitter, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., on brief), for appellant.

J. Sam Johnson, Jr., Greensboro, N.C. (Dees, Johnson, Tart, Giles & Tedder, Greensboro, N.C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and WIDENER, Circuit Judge.

WIDENER, Circuit Judge:

This diversity case is an appeal from a jury verdict on a counterclaim against Burger Chef and the dismissal of Burger Chef's declaratory judgment action. It concerns the construction of a lease under the law of North Carolina. We affirm in large part, but reverse as to one item.

Melfred Company (Melfred) owns some land in Forsyth County, North Carolina. On November 8, 1968, it entered into a lease (later amended) with Burger Chef Systems, Inc. (Burger Chef), which is a subsidiary of General Foods Corporation (General Foods). Under the terms of the lease, Melfred was to erect a building on the land and lease it to Burger Chef for a term of twenty years, with Burger Chef having the right to ex-

tend the lease for an additional ten years. The plans and specifications for the building were furnished by Burger Chef. General Foods guaranteed payment of the rent of $15,700 per year, or $1,308.33 per month.

Under the provisions of the lease, Burger Chef agreed to insure all improvements with fire and extended coverage insurance equal to their replacement value and to furnish to Melfred a certificate of renewal of the fire insurance policies twenty days prior to their expiration. The lease provided that "the lessor shall be solely entitled to any insurance proceeds received by reason of said destruction or damage [by fire], and the improvements shall be restored to its [sic] prior condition by the lessor with all reasonable diligence. The lessor shall make the entire proceeds of the insurance policies available for the restoration of the improvements and shall keep said proceeds in a separate trust account for that purpose." In the same paragraph of the lease, rent was waived for such period of time following a fire loss as the premises were not usable for business purposes.

The lease agreement further provided that the lessee had the right to sublet the premises and for the allowance of attorneys' fees to the prevailing party in a suit over the terms of the lease.

Burger Chef, which is in the self service food business, took possession of the premises September 1, 1969. On January 17, 1972, it sent to Melfred the certificate of insurance which is involved here. It was issued by Allendale Insurance Company to General Foods, naming Burger Chef as an additional named insured in the amount of $200,000, and provided that any loss "shall be adjusted with Burger Chef Systems, Inc., and payable to Burger Chef Systems, Inc., and the additional interests as outlined below:

The Melfred Company–lessor . . . Volunteer State Life Insurance Company–mortgagee."

The policy of insurance, however, turned out to have a $100,000 deductible clause, and, to make matters worse, it provided that Burger Chef would repay, within 30 days, 100% of the first $100,000 of any loss paid by the insurance company. Thus, in at least one light, Burger Chef was self insured for the first $100,000 of a loss.

On September 25, 1972, the building was substantially destroyed by fire, rendering it unusable for the purposes contemplated in the lease.

Burger Chef and Melfred immediately engaged in discussions with the insurance company, trying to settle the loss. At no time during the long series of settlement negotiations, offers, and gathering and submission of bids does the record show that Melfred ever did any act inconsistent with the lease agreement. It took the position from the first, as it now takes, that it was entitled to the proceeds of the fire loss and upon receipt of the proceeds was obligated to reconstruct the building.

Burger Chef, on the other hand, from the very outset, and even until argument in this court, insists that it has the authority to adjust the fire loss and at least a joint right to payment of the proceeds. Its insistence on these points all through the negotiations prevented any consummation of them, prevented any settlement of Melfred's claim, prevented the rebuilding of the building, and brought about the present difficulty between the parties. When it is considered that the first estimates submitted following the fire were in the neighborhood of $60,000 and were procured by Burger Chef, the reason is apparent for Burger Chef's insistence that it have the right to make the adjustment of and receive the fire insurance proceeds: it would have saved some $40,000.

█ We do not put any such strained construction on the terms of the lease. We do not even resort to the rule that the lease should be construed against the party preparing it, *Coulter v. Capital Finance Co.,* 266 N.C. 214, 146 S.E.2d 97 (1966). The lease provided that all of the insurance proceeds were to go to Melfred. It further provided that Melfred was to hold the funds in a trust account and to reconstruct the building. To engraft onto this the right of Burger Chef to adjust the loss and to re-

ceive the proceeds, so as to place Melfred in the position of having to reconstruct a building according to plans furnished by Burger Chef while Burger Chef had a direct financial interest in keeping any insurance payment as far below $100,000 as possible, is so beyond the bounds of credulity that we, as did the district court, refuse so to construe the language of the lease in the absence of some explicit provision which is not present.

After negotiations between the insurance company, Melfred, and Burger Chef had been going on for more than seven months without result, Burger Chef sued Melfred in the district court, seeking a declaratory judgment. It asked the court to declare that the lease was in full force and effect, that Burger Chef had the right under the terms of the lease to restore and repair the premises and sublease such property for the remainder of the term, and that Burger Chef had the right under the terms of the lease to convert the proceeds of the insurance coverage to its own use and apply those proceeds solely for the repair and restoration of the leased premises.

The district court, quite properly, granted summary judgment to Melfred on the ground that there was no ambiguity in the lease because "The language of the lease . . . fully define[d] the duties of the parties in the event of a casualty loss." It recited that Burger Chef had not turned over the insurance proceeds to Melfred, which would be a condition precedent to Melfred's duty to restore the premises. As to subleasing, the court noted that the provision in the lease as to subleasing was without restriction, and that any question of subleasing was premature since the premises had not been restored.

Melfred had filed a counterclaim, in which it contended that Burger Chef had not insured the premises as agreed upon in the lease; that its statement that it had insurance was false and known to be false when made; that it had failed and refused to cooperate in the adjustment of the policy, even on its own terms; that the declaratory judgment action was instituted for the purpose of delay; that Burger Chef had otherwise intentionally delayed the settlement claim; that the building was further deteriorating; and that Melfred had been damaged in the amount of the replacement value, loss of marketability of the property, incidental damage in attempting to secure performance of the lease, causing Melfred to be without funds to meet its mortgage payments, and for attorneys' fees and punitive damages.

The counterclaim was tried and went to the jury, which arrived at the following special verdict, upon which judgment was entered:

"1. Did the plaintiff breach the Lease Agreement with the defendant in failing to provide insurance proceeds for the replacement value of the fire damaged building?

ANSWER: "Yes."

"2. What is the replacement value of the fire damaged building which defendant is entitled to recover of Plaintiff?

ANSWER: "$173,742.00."

"3. What amount, if any, is the defendant entitled to recover of plaintiff in compensatory damages for loss of time and expense incurred because of the delay?

ANSWER: "$500.00."

"4. Did the plaintiff breach the Lease Agreement by failing to pay rent from February 1, 1974 to present?

ANSWER: "Yes."

"5. If so, what amount is defendant entitled to recover for unpaid rent?

ANSWER: "$15,615.43."

"6. Did plaintiff commit fraud in assuring the defendant that it was fully insured under Lease Agreement for replacement value of the building?

ANSWER: "Yes."

"7. What amount, if any, is the defendant entitled to recover in punitive damages?

ANSWER: "$200,000.00."

Burger Chef complains of all of the judgment, the principal claims, of course, relating to the answers to questions 2 and 7.

Although technically, just after the fire, Melfred may have ·been able to sue the insurance company on account of the loss, and that is quite doubtful because of Burger Chef's self imposed [1] right to adjust the loss and claim a joint interest in the proceeds, and a clause in the policy providing for no liability for losses less than the deductible amount, whatever opportunity there may have been was brought to an end by Burger Chef's filing its suit against Melfred, in which suit it claimed the right to all the insurance proceeds. Melfred's counterclaim at that point was quite justified.

■ We think there is no doubt there is ample evidence for a finding that Burger Chef breached the terms of the lease agreement when it procured a policy of insurance with a $100,000 deductible cause which it had to pay, and in further providing, contrary to the plain terms of the lease, that it had the right to adjust the loss and jointly receive the proceeds.[2] As we have before stated, its financial interest in holding the adjustment down, while at the same time being able to require the replacement of the premises, places too great a strain on our imagination to accept the proposition.

■ That this is self-evident probably accounts for Burger Chef's emphasis on the measure of compensatory damages as to the replacement value of the property, rather than as to their award in any event. Burger Chef's claim of error as to the compensatory award of $178,742 is that the district court erred in instructing the jury that it could also consider any damage to Melfred in the marketability of the property because its loss should be limited to the replacement value. The part of the instruction objected to is here quoted: "The defendant further says that it has been damaged in the marketability of its property by the plaintiff's failure to provide funds to restore the building, and that you should accept the testimony of Dixon that it will cost $178,742 to now restore the building by reason of the deterioration due to the elements since the fire. . . ."

We do not think that the instruction of the district court was erroneous. Although the use of the word "marketability" may have been unfortunate, there is no doubt that the question which was put to the jury was whether the damage was $178,742, as shown by Melfred's testimony, or various lesser sums contended for by Burger Chef.[3] The district judge later charged the jury, "Now, the amount of the actual damages under the breach of contract period that you should award the Defendant is whatever amount you feel is necessary to place the Defendant as near as can be done in money to the same position it would have occupied if the contract had been performed." No one disputes the correctness of this latter proposition, and upon consideration of the charge as a whole, we are of opinion it is free from reversible error. *McClure v. Price,* 300 F.2d 538 (4th Cir. 1962). It is also clear to us that the contention of Burger Chef that the court allowed the jury to consider the loss of use of the property is not supported by the instructions given.

The essence of Burger Chef's argument as to punitive damages is that the evidence does not support the verdict. It relies on the North Carolina law that as a general rule, exemplary damages are not recoverable in action for breach of contract. *Swinton v. Savoy Realty Co.,* 236 N.C. 723, 73

---

1. We note the district judge instructed the jury without objection: "Plaintiff [Burger Chef] admits that the adjustment provision prevented negotiations between the Defendant [Melfred] and Allendale . . ."

2. It is not necessary to rest our decision on this point, and we mention it because argued orally. The first question put to the jury is an accurate statement of Burger Chef's obligation under the lease, and the evidence is ample to support the jury's finding that Burger Chef did not perform.

3. In all events, the jury verdict in the amount of $178,742, the exact amount of Melfred's testimony as to replacement value, is a good indication it was not confused by the instructions. The word "marketability" was also used in another place in the instructions, but was not defined, and nothing in the instructions indicates the use of the word was other than inadvertent and harmless.

S.E.2d 785, 787 (1953), and argues that, because the controversy arose out of a dispute over the lease, the rule against exemplary damages for breach of contract should serve to exonerate it. The district court, however, charged the jury as to fraud, not breach of contract, so that theory here is abstract argument.

■ The parties are agreed that in North Carolina aggravated fraud is necessary to sustain awards of punitive damages in such cases as here. See *Swinton,* 73 S.E.2d at 787; *King v. Insurance Company,* 273 N.C. 396, 159 S.E.2d 891 (1968). In such cases it is said there must be some element of asocial behavior which goes beyond the facts necessary to create a case of simple fraud. *Swinton,* 73 S.E.2d at 787. There must have been shown additional elements of insult, indignity, malice, oppression or bad motive. *Poplin v. Ledbetter,* 6 N.C.App. 170, 169 S.E.2d 527 (1969). A reading of the North Carolina cases causes us to be of opinion that exemplary damages go on a case by case basis, and the rule applied though infrequently expressed is found in *Swinton* as follows: ". . . we think the rule is that the facts in each case must determine whether the fraudulent representations alleged were accompanied by such acts and conduct as to subject the wrongdoer to an assessment of additional damages, for the purpose of punishing him for what has been called his 'outrageous conduct.' " 73 S.E.2d at 787. See also *Hardy v. Toler,* 288 N.C. 303, 218 S.E.2d 342, 344 (1975); *Clouse v. Chairtown Motors, Inc.,* 17 N.C.App. 669, 195 S.E.2d 327, 328–9 (1973).

■ Applying this rule to the case before us, we think that the obstinacy of Burger Chef, high-handed as it was, does not amount to the degree of reprehensibility required by the North Carolina courts to award punitive damages when the dispute grows out of a breach of contract, although the facts may indicate elements of a tort independent of the contractual dispute.

In *Swinton* an aged, uneducated couple had been sold a lot upon which it was falsely represented their home stood; this was held to be insufficient and an award of punitive damages was set aside. In *King* a liability insurance company refused to defend a claim against its insured. The court held that an allegation that the breach of contract was "willful," "intentional," in "wanton disregard of the rights of the plaintiff" and "calculated . . . to hamper, prevent and impair the plaintiff's legal position" in a pending suit did not "give rise to a cause of action sounding in tort." 159 S.E.2d at 893. Of like effect is *Girard Trust Bank v. Easton,* 3 N.C.App. 414, 165 S.E.2d 252 (1965), where, in a dispute over a financing agreement, allegations that acts in connection with a breach of contract were "wilful, intentional, malicious, and done with the intent of injuring" were held insufficient.

We think that Burger Chef's conduct here, as previously outlined, is not so outrageous as that of the defendants found in *Swinton* and alleged in *King,* and that if our case were to be decided by the North Carolina court it would set aside the judgment as to punitive damages. That is the rule we will follow. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Burger Chef also complains of the jury awards for delay and unpaid rent. We are of opinion those issues were submitted to the jury under proper instructions and that the evidence was sufficient to support the verdict in both instances.

In passing we note that the parties did not agree at oral argument as to whether the lease is yet in effect. Also alluded to were problems which may arise such as ever-increasing building costs. We express no opinion as to these because they are not before us.

The judgment of the district court in dismissing the declaratory judgment action and in its award of damages is in all respects affirmed except the single item of the judgment for punitive damages, which must be vacated and judgment entered for Melfred in an amount not to include punitive damages.

Melfred will recover its taxable costs.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.