STAN D. BOWLES DISTRIBUTING COMPANY v. PABST BREWING COM-
PANY AND PABST BREWING COMPANY, D/B/A BLITZ-WEINHARD COM-
PANY AND JEFFREYS BEER AND WINE COMPANY

No. 838SC428

(Filed 3 July 1984)

1. **Contracts § 12.1— amendment of beer distributorship agreement—no expansion of products**

   An amendment of a beer distributorship agreement giving plaintiff
   distributor the right to sell and distribute "Pabst beer products" in any area
   did not expand the products available to plaintiff under the original agreement
   granting plaintiff the right to distribute "Pabst beer and ale."

2. **Contracts § 12.1— distributorship agreement—beer and ale—inclusion of malt liquor**

   A distributorship agreement granting plaintiff the right to sell and
   distribute "Pabst beer and ale" included malt liquor, and defendant brewer
   was obligated under the agreement to sell plaintiff Olde English 800 Malt
   Liquor.

3. **Corporations § 1— breach of distributorship agreement—decision allegedly made by subsidiary**

   The corporate defendant could not avoid liability for its breach of a
   distributorship agreement by failing to sell a malt liquor product to plaintiff
   beer distributor on the ground that a wholly-owned subsidiary had full respon-
   sibility for all marketing decisions with respect to the malt liquor where de-
   fendant manufactured and sold the malt liquor while the subsidiary served
   merely as a marketing division, and plaintiff previously conducted all its
   negotiations with defendant and had entered into the distributorship agree-
   ment with defendant.

4. **Customs and Usages § 1— erroneous finding based on custom in indus-
   try—court's decision not affected**

   Although the trial court erred in finding that under industry customs and
   practices plaintiff beer distributor had the right to expect its franchise rights
   to be exclusive and that defendant brewer violated those rights by selling a
   malt liquor product to another distributor for the same territory where an
   amendment to the distributorship agreement gave defendant brewer the right
   to sell its products to any person in any area, such findings did not affect the
   trial court's determination that defendant brewer breached the distributorship
   agreement by refusing to sell a malt liquor product to plaintiff.

5. **Damages § 3.6— agreement limiting consequential damages**

   Parties may limit contractually or exclude consequential damages unless
   the limitation or exclusion is unconscionable.

**6. Damages § 3.6— exclusion of consequential damages—listing by parties**

When the parties specifically list the types of consequential damages to be excluded, only those consequential damages are excluded.

**7. Contracts § 27.3; Damages § 3.5— breach of distributorship contract—agreement excluding loss of profits—entitlement to diminution in value of franchise**

Where a beer distributorship agreement provided that defendant brewer would not be liable "for any loss of profits by distributor or for any part of distributor's sales promotion, organization, business investment, operating or other expenses," plaintiff distributor was not entitled to recover for loss of profits for defendant's breach of the distributorship agreement but was entitled to recover damages for the diminution in value of the franchise.

**8. Contracts § 27.3— breach of distributorship agreement—damages for diminution in value of franchise**

In an action for defendant brewer's breach of a beer distributorship agreement by refusing to sell a malt liquor product to plaintiff distributor, defendant was liable only for diminution in value of the distributor's franchise resulting from plaintiff's inability to sell the malt liquor product made by defendant and was not liable for any diminution in value attributable to agreements plaintiff had with other companies.

**9. Contracts § 27.3— breach of contract—punitive damages not justified**

The trial court erred in awarding punitive damages for breach of contract where the evidence was indicative of a good faith dispute over interpretation of the contract and did not establish aggravated tortious conduct as well.

APPEAL by defendant Pabst Brewing Co. from *Lane, Judge.* Judgment entered 12 October 1982 in Superior Court, WAYNE County. Heard in the Court of Appeals 8 March 1984.

Defendant Pabst appeals from a judgment finding that it breached its contract with plaintiff and awarding compensatory and punitive damages.

*Brown, Fox and Deaver, by Bobby G. Deaver, and George R. Kornegay, Jr., P.A., by Janice S. Head and George R. Kornegay, Jr., for plaintiff appellee.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by Michael E. Weddington and Martha Jones Mason, for defendant Pabst Brewing Co., appellant.*

WHICHARD, Judge.

I.

The facts giving rise to this action are that plaintiff and defendant Pabst entered into a written distributorship agreement

on 23 January 1975. Plaintiff was a wholesale distributor for alcoholic malt beverage products. Defendant Pabst was a national brewer "engaged in the manufacture and sale of Pabst beer and Pabst ale." The agreement granted plaintiff the right to sell "Pabst beer and ale" in the counties of Wilson, Greene, Wayne, and Lenoir. The agreement also provided that "[n]otwithstanding the use hereinafter of the words 'beer and ale' and 'beer or ale,' or the use of the word 'Pabst,' this agreement shall apply to and cover only the product or products expressly first named above in this paragraph 1." The parties agreed that the agreement would be "governed by and interpreted in accordance with the laws of the State of Illinois."

On 24 January 1975 plaintiff and defendant Pabst entered into an amendment to the distributorship agreement. Paragraph four of the amendment provided that

[a]ny provisions in the distributorship agreements with the distributor which limit or restrict the sale and distribution of any Pabst beer products by the distributor to a particular geographical area or territory or to any type or class of customer are hereby modified to provide that such geographical area or territory shall hereafter constitute the distributor's area of primary marketing responsibility, and hereafter Pabst and the distributor shall have the right to sell and distribute Pabst beer products in any place or area that, and to any person to whom, Pabst or the distributor may be lawfully authorized so to do.

The above amendment was added to every Pabst distributor's contract regardless of what products the distributor was authorized to sell under the contract.

In March 1979 defendant Pabst entered into an "Asset Purchase Agreement" with Blitz-Weinhard Co., whereby defendant Pabst acquired all rights to Olde English 800 Malt Liquor. Blitz-Weinhard then served as a marketing division for defendant Pabst for Olde English 800. In August 1979 plaintiff placed an order with defendant Pabst for 2,184 cases of Olde English 800. Defendant Pabst did not fill the order. It contended that the right to distribute Olde English 800 had been granted to defendant Jeffreys. It also contended that it was not obligated to sell Olde

English 800 to plaintiff because the contract did not include malt liquor.

Plaintiff then commenced this action for breach of contract. The court, sitting without a jury, found that defendant Pabst had breached the contract. It awarded plaintiff $168,000 for the diminution in the value of his franchise after the breach and $150,000 in punitive damages.

Defendant Pabst appeals.

II.

Defendant Pabst first contends the court erred in finding that it breached its contract with plaintiff by not selling Olde English 800 to plaintiff. It is undisputed that defendant Pabst did not sell Olde English 800 to plaintiff. This would not constitute a breach, however, unless the distributorship agreement, considered with the amendment, required such sale. Thus, the resolution of the issue depends on the interpretation given the agreement.

The court made findings of fact to the effect that Olde English 800 was a Pabst beer product and thus defendant Pabst was obligated to sell it to plaintiff. Ordinarily, "[t]he court's findings of fact are conclusive if supported by any competent evidence, and judgment supported by them will be affirmed even though there is evidence contra." *Spivey v. Porter*, 65 N.C. App. 818, 819, 310 S.E. 2d 369, 370 (1984); *see also Hunter v. DeMay*, 124 Ill. App. 2d 429, 438, 259 N.E. 2d 291, 295 (1970). If the finding of fact is essentially a conclusion of law, however, it will be treated as a conclusion of law which is reviewable on appeal. *Britt v. Britt*, 49 N.C. App. 463, 470, 271 S.E. 2d 921, 926 (1980); *Wachacha v. Wachacha*, 38 N.C. App. 504, 507, 248 S.E. 2d 375, 377 (1978); *see also Blackard Construction Co. v. Berry*, 13 Ill. App. 3d 768, 772, 300 N.E. 2d 627, 630 (1973). The interpretation of a contract "has uniformly been treated as a question of law subject to review by the appellate courts." *Davison v. Duke University*, 282 N.C. 676, 712, 194 S.E. 2d 761, 783 (1973); *see also Rosenbaum Bros. v. Devine*, 271 Ill. 354, 357, 111 N.E. 97, 98 (1915); *Blackard Construction Co. v. Berry, supra.*

The basic rule of construction for contracts is that the court

seeks to ascertain the intent of the parties at the moment of execution. To ascertain this intent, the court looks to the language used, the situation of the parties, and objects to be accomplished. Presumably the words which the parties select were deliberately chosen and are to be given their ordinary significance.

*Briggs v. Mills, Inc.*, 251 N.C. 642, 644, 111 S.E. 2d 841, 843 (1960); *see also Marshall Field & Co. v. J. B. Noelle Co.*, 81 Ill. App. 2d 409, 414, 226 N.E. 2d 454, 457 (1967); *Brown v. Scism*, 50 N.C. App. 619, 623, 274 S.E. 2d 897, 899-900, *disc. rev. denied*, 302 N.C. 396, 276 S.E. 2d 919 (1981). Further, "[w]here the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." *Crockett v. Savings & Loan Assoc.*, 289 N.C. 620, 631, 224 S.E. 2d 580, 588 (1976); *see also Brown v. Miller*, 45 Ill. App. 3d 970, 972, 360 N.E. 2d 585, 587 (1977).

[1]    Here, the agreement granted plaintiff the right to distribute "Pabst beer and ale." Plaintiff contends that the clause in the amendment providing that "hereafter Pabst and the distributor shall have the right to sell and distribute Pabst beer products in any place or area" expands the Pabst products it could sell. We disagree for two reasons. First, the agreement provided that "[n]otwithstanding the use hereinafter of the words 'beer and ale' and 'beer or ale,' or the use of the word 'Pabst,' this agreement shall apply to and cover only the product or products expressly first named above in this paragraph 1." It is clear that defendant Pabst used the same form contract with all of its distributors. It inserted in paragraph one the particular products the distributor was authorized to sell. In light of this, a reference to Pabst beer products in the amendment, instead of a reference merely to Pabst or to beer and ale, does not appear intended to expand the type of products a distributor was authorized to sell in paragraph one. Second, paragraph thirteen of the agreement provides that "neither this contract nor any of the terms thereof may be changed or modified or waived except in writing." Paragraph four of the amendment, although it uses the terms Pabst beer prod- ucts, instead of merely the term Pabst, does not attempt to change or modify the type of Pabst products the distributor can sell. Instead, it refers to the geographical area or territory for which a distributor will have responsibility. Since there is no

written agreement modifying the type of Pabst products to be distributed as required by paragraph thirteen, paragraph one determines whether defendant Pabst was obligated to sell Olde English 800 to plaintiff.

[2]   Paragraph one grants plaintiff the right to sell "Pabst beer and ale." The question thus is whether those terms encompass malt liquor. Based upon the language of the contract and the evidence presented, we hold that the court was correct in finding that the contract required defendant Pabst to sell Olde English 800 to plaintiff.

The agreement states that "Pabst is engaged in the manufacture and sale of Pabst beer and Pabst ale." It makes no reference to any other type of product manufactured or sold by defendant Pabst. It thus could be concluded that any product manufactured or sold by defendant Pabst had to be included within the terms beer and ale. Further, the agreement grants plaintiff the right to sell "Pabst beer and ale." Since these are the only terms used to describe the products manufactured and sold by defendant Pabst, the logical interpretation is that the agreement grants plaintiff the right to distribute any product manufactured and sold by defendant Pabst. Plaintiff testified that "[p]rior to the time that Olde English 800 came into North Carolina, . . . there [were no] Pabst beer products authorized in this state that [plaintiff] did not distribute."

There also was sufficient evidence, though not decisive on the interpretation issue, to support the conclusion that the terms "Pabst beer and ale," as used in the agreement, included Olde English 800. First, plaintiff testified that his understanding of the agreement was that he was authorized to distribute any product defendant Pabst manufactured. Second, a bill of lading sent to defendant Jeffreys from defendant Pabst refers to "malt beverage beer." Third, the top of a case of Olde English 800 contained the language "rotate your stock, put new stock, higher numbers behind or beneath present stock, keep selling fresh beer." Fourth, in a semi-annual report to stockholders, defendant Pabst used the term beer to describe all Pabst products sold. The secretary for defendant Pabst stated that in the report beer was used as "a generic word [which] include[d] beer, ale, malt liquor, stout, saki." Finally, there was evidence that although there is a technical

distinction between the way beer and malt liquor are brewed, and in their alcohol content, they often are referred to as the same product by persons in the trade.

For these reasons, we hold that the court was correct in finding that defendant Pabst was obligated under the agreement to sell Olde English 800 to plaintiff, and in concluding that the failure to do so constituted a breach.

## III.

[3] Defendant Pabst next contends that if there was a breach of the contract, it should not be liable because "the decision not to sell Olde English 800 to plaintiff was made by another company, the Blitz-Weinhard Co." It argues that Blitz-Weinhard Co. was "a wholly-owned subsidiary of Pabst [and] had full responsibility for all marketing decisions with respect to Olde English 800 and all other Blitz brands."

Defendant cites *CM Corp. v. Oberer Development Co.*, 631 F. 2d 536 (7th Cir. 1980); *American Trading & Production Corp. v. Fischbach & Moore, Inc.*, 311 F. Supp. 412 (N.D.Ill. 1970); and *Huski-Bilt, Inc. v. Trust Co.*, 271 N.C. 662, 157 S.E. 2d 352 (1967), as authority for the proposition that it is inappropriate to pierce the corporate veil unless the subsidiary is the "mere instrumentality" of the parent. Although these cases do stand for that proposition, their facts are distinguishable from those here.

In *CM Corp.* plaintiff brought an action for breach of contract and breach of warranty against a construction contractor and its corporate parent. All contracts had been entered into with the construction contractor, and it was only after the construction contractor became insolvent that plaintiff sought to recover from the parent. In *American Trading* plaintiff brought an action against a parent corporation and its subsidiary for damages from a fire caused by faulty electrical wiring installed by the subsidiary. The parent did not enter into the contract nor did it provide any of the wiring or perform any of the work. In *Huski-Bilt* plaintiff sought to hold a bank liable, upon prepayment of loans, for unearned premiums paid on credit life insurance policies. The bank had collected and delivered the money to the insurance company. The bank and three of its officers also owned the majority of stock in the insurance company. The Court held that the bank and

the insurance company were separate corporations and mere ownership of stock was insufficient reason to hold one liable for the actions of the other.

Here, the court made the following finding of fact:

12. On March 31, 1979 PABST and BLITZ entered into a Purchase of Asset Agreement whereby PABST obtained, *inter alia*, all rights to the brand name "OLDE ENGLISH 800 MALT LIQUOR," and the right to manufacture and market said product; thereafter, and prior to the commencement of this action, PABST began to manufacture the PABST beer product, "OLDE ENGLISH 800" and became legally authorized to sell it to its distributors in the State of North Carolina. B-W [BLITZ-WEINHARD COMPANY] was formed by PABST and constituted a marketing division for a few months thereafter.

The court's findings "are conclusive if supported by any competent evidence, and judgment supported by them will be affirmed even though there is evidence contra." *Spivey v. Porter, supra; see also Hunter v. DeMay, supra.* There was sufficient evidence to support the finding that defendant Pabst manufactured and sold Olde English 800, while Blitz-Weinhard served merely as a marketing division. Further, plaintiff previously conducted all its negotiations with defendant Pabst and had entered into the distributorship agreement with defendant Pabst.

In the cases discussed above, the plaintiffs had dealt exclusively with subsidiaries and then had sought to hold parent corporations liable. The foregoing findings, which are supported by competent evidence, establish that this is not the situation here. We thus find the cases cited by defendant not controlling, and its contention without merit.

IV.

[4] Defendant Pabst also contends the case should be reversed because the court's ruling was based upon a misapprehension of the law. If the misapprehension of the law does not affect the result, however, the judgment will not be reversed. *See Lowe v. Department of Motor Vehicles*, 244 N.C. 353, 93 S.E. 2d 448 (1956).

The following findings of fact are at issue:

11. [A]ccording to the customs and practices of the beer distributors in North Carolina against dual distributors, BOWLES had the right to expect said franchise rights to be exclusively its own, notwithstanding the written agreement to the contrary.

. . . .

19. That the greater weight of the evidence indicates that "OLDE ENGLISH 800" MALT LIQUOR is a PABST beer product and that only PABST had the right to sell said beer product to its distributors in the State of North Carolina; that PABST contracted with JEFFREYS in early August, 1979 for JEFFREYS to distribute "OLDE ENGLISH 800" MALT LIQUOR in the counties of Wayne, Wilson, Lenoir and Greene, the identical area of primary marketing responsibility as that contracted to BOWLES, thereby preempting BOWLES' rights and effecting a wrongful partial termination of its franchise rights.

The parties in paragraph four of the amendment provided that "hereafter Pabst and the distributor shall have the right to sell and distribute Pabst beer products in any place or area that, and to any person to whom, Pabst or the distributor may be lawfully authorized so to do."

Since the express terms of a contract generally control over industry customs or usages of trade, Ill. Ann. Stat. ch. 26, § 1-205(4) (Smith-Hurd 1963); N.C. Gen. Stat. § 25-1-205(4) (1965), the court erred in finding that plaintiff had the right to expect its franchise rights to be exclusive. It was irrelevant whether defendant Pabst sold Olde English 800 to other distributors in the area, since the issue was whether defendant Pabst breached its agreement by not selling Olde English 800 to plaintiff. As stated earlier, there was sufficient evidence to support the court's conclusion that defendant Pabst breached its agreement. Thus, the court's findings in paragraphs eleven and nineteen could not have affected the result. *See Lowe v. Department of Motor Vehicles, supra; Industries, Inc. v. Construction Co.,* 29 N.C. App. 270, 224 S.E. 2d 266, *disc. rev. denied,* 290 N.C. 551, 226 S.E. 2d 509 (1976).

## V.

Defendant Pabst next contends the court erred in its award of compensatory damages. The court made the following findings of fact regarding damages:

17. Considering BOWLES' Answers to defendant PABST'S Interrogatories, the testimony of BOWLES' President, and the testimony of officers and employees of JEFFREYS and PABST, BOWLES suffered a loss of profit in the amount of at least $100,000.00 as a result of the malicious breach of said contract by PABST in its successful effort to put BOWLES out of business.

18. As a proximate result of PABST'S malicious breach of its obligation to sell PABST beer products to BOWLES and its successful efforts to put BOWLES out of business, the value of BOWLES' franchise right to distribute PABST beer products in the counties of Wayne, Wilson, Greene and Lenoir was diminished from its value of $169,000 before said breach to a value of only $1,000.00 after said breach, considering that said franchise was diminished by the loss of goodwill, loss of reputation among its customers and bankers and was in fact sold for only $1,000.00 by BOWLES in 1980.

The court did not award plaintiff the $100,000 in lost profits found in the first of the above findings, but did award the $168,000 in diminution of the value of plaintiff's franchise found in the second.

[5, 6] Defendant Pabst argues that it should not be liable for damages for diminution of value because of the following clause in the agreement:

11. . . . Under no circumstances shall Pabst be liable for any loss of profits by distributor or for any part of distributor's sales promotion, organization, business investment, operating or other expenses . . . .

It is clear that parties may limit contractually or exclude consequential damages "unless the limitation or exclusion is unconscionable." Ill. Ann. Stat. ch. 26, § 2-719(3) (Smith-Hurd 1963); N.C. Gen. Stat. § 25-2-719(3) (1965). In order to avoid a finding of unconscionability, the contract must provide "minimum adequate remedies." *See* J. White & R. Summers, Handbook of the Law

Under the Uniform Commercial Code § 12-11, at 472-73 (1980). As the drafters of the Uniform Commercial Code stated, "[i]f the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." Ill. Ann. Stat. ch. 26, § 2-719 official comment 1 (Smith-Hurd 1963); N.C. Gen. Stat. § 25-2-719 official comment 1 (1965). Courts rarely find limitation clauses in transactions between experienced businessmen unconscionable. J. White & R. Summers, *supra*, § 12-9, at 463. When the parties specifically list the types of consequential damages to be excluded, only those consequential damages are excluded.

[7]  Here, the provision in paragraph eleven, *supra*, was the only reference to damages in the agreement. It does not state that it excludes all consequential and special damages, but lists the items that defendant Pabst would not be liable for. The paragraph clearly does exclude loss of profits, and the court thus was correct in not awarding the $100,000 it found plaintiff had suffered in lost profits. Although the list of items excluded is extensive, we do not believe it includes damages for the diminution of value of the franchise, however. Even so, an issue remains as to whether the evidence supports the award of $168,000 for diminution of value of the franchise.

[8]  Since the court was sitting without a jury, its findings "are conclusive if supported by any competent evidence, and judgment supported by them will be affirmed even though there is evidence contra." *Spivey v. Porter, supra; see also Hunter v. DeMay, supra.* Here, the evidence relating to the diminution of value of the franchise came from plaintiff's financial statements, income tax returns, and contract for sale of the distributorship.

The financial statement for the year ending 31 December 1978 stated that the value of the franchise was $168,407, and the value of the buildings and other depreciable assets was $37,431. The tax returns for the year ending 31 December 1979 stated that the value of the franchise was $168,407, and the value of the buildings and other depreciable assets was $33,641.

The contract for sale of the distributorship also was entered into on 31 December 1979. This was four months after the breach of the contract between plaintiff and defendant Pabst. It also was

four months after plaintiff filed this action, and two months after defendant Pabst filed a counterclaim seeking to terminate the distribution agreement. In the contract for sale the purchase price was $175,000. The breakdown was as follows:

| | |
|---|---|
| Good Will and customer lists | $1,000.00 |
| Noncompetition Covenant from Seller Corporation | $5,000.00 |
| Trucks, physical equipment, and other personal property | $169,000.00 |

Based on the above evidence, the court concluded that the diminution of value was $168,000, and that plaintiff was entitled to that sum as compensatory damages. We disagree.

The evidence also showed that plaintiff had franchise agreements with several companies, not just with defendant Pabst. The contract for sale states that it is contingent upon the buyer "being granted the necessary approvals, licenses, and Franchise Agreements" from the following:

(a) Franchise Agreement acceptable to Buyer from Pabst Brewing Company for Pabst, Pabst Extra Light, Andeker and Red White and Blue.

(b) Country Club beer and malt beverage.

(c) Pearl beer and malt beverage.

(d) Century Brewing Company for Champale and Pink Champale.

(e) Perrier Mineral Water.

(f) Pennsylvania Dutch Birch Beer.

(g) Yoo Hoo Chocolate Drink.

Thus, the purchase price included the right to sell all of the above brands.

Further, the $168,407 listed in the financial statements of plaintiff and labeled as the value of the "franchise" appears to be the total value for the right to sell all the above brands, not just Pabst. Plaintiff stated that the franchise figure on 31 December 1974 was $25,000. In 1975 plaintiff purchased Bagley Wholesale

and thereby acquired a franchise agreement with defendant Pabst. The financial statements for plaintiff then show that on 31 December 1975 and 31 December 1976 the franchise amount was $144,406. In 1977 plaintiff entered into an additional agreement with Champale which gave him the right to distribute Champale beer products in additional territory. The financial statement for plaintiff for the year ending 31 December 1977 listed the value of plaintiff's franchise as $168,407. Plaintiff testified that the increase was due to acquiring the rights from Champale. Thus, although the financial statements and tax returns summarily state that the value of the franchise was $168,407, it does not appear that the entire amount was attributable to the agreement with defendant Pabst.

The court, however, made no finding as to what portion of the $168,407 was attributable to the agreement with defendant Pabst and what portion was attributable to agreements plaintiff had with other companies. Neither did the court make such findings in regard to the contract for sale. These findings were essential to a proper award of compensatory damages, since a breaching party is liable only for damages "naturally and proximately caused by the breach." *Sineath v. Katzis*, 218 N.C. 740, 757, 12 S.E. 2d 671, 682 (1941). Thus, defendant Pabst would be liable only for the diminution in value resulting from plaintiff's inability to sell Olde English 800.

## VI.

[9] Defendant Pabst finally contends the court erred in awarding $150,000 in punitive damages. Our Supreme Court has stated the rule for awarding punitive damages in a contract action as follows:

> [P]unitive damages are not recoverable for breach of contract with the exception of breach of contract to marry. . . . But when the breach of contract also constitutes or is accompanied by an identifiable tortious act, the tort committed may be grounds for recovery of punitive damages. . . . Our recent holdings in this area of the law clearly reveal, moreover, that allegations of an identifiable tort accompanying the breach are insufficient alone to support a claim for punitive damages.

*Stanback v. Stanback,* 297 N.C. 181, 196, 254 S.E. 2d 611, 621 (1979); *see also St. Ann's Home for the Aged v. Daniels,* 95 Ill. App. 3d 576, 580, 420 N.E. 2d 478, 481-82 (1981). Further, "the tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed. . . . Such aggravated conduct was early defined to include 'fraud, malice, such a degree of negligence as indicates a reckless indifference to consequences, oppression, insult, rudeness, caprice, wilfulness . . . .' " *Newton v. Insurance Co.,* 291 N.C. 105, 112, 229 S.E. 2d 297, 301 (1976) (quoting *Baker v. Winslow,* 184 N.C. 1, 113 S.E. 570 (1922) ); *see also Wallace v. Prudential Insurance Co.,* 12 Ill. App. 3d 623, 629-30, 299 N.E. 2d 344, 348-49 (1973).

Here, the court's findings were insufficient to support an award of punitive damages. The court made conclusions that the breach was "willful," "intentional," "in reckless disregard of the rights of [plaintiff]," and "malicious." The evidence, however, is more indicative of a good faith dispute over interpretation of the contract. It does not establish aggravated tortious conduct as well. It thus falls short of establishing the "degree of reprehensibility required . . . to award punitive damages when the dispute grows out of a breach of contract." *Burger Chef Systems, Inc. v. Melfred Co.,* 547 F. 2d 786, 791 (4th Cir. 1976); *see also Florsheim v. Travelers Indemnity Co.,* 75 Ill. App. 3d 298, 310, 393 N.E. 2d 1223, 1233 (1979); *King v. Insurance Co.,* 273 N.C. 396, 398, 159 S.E. 2d 891, 893 (1968). We thus vacate the award of punitive damages.

## VII.

With the exception of the portions relating to plaintiff's damages, the judgment is affirmed. The portions relating to plaintiff's damages are vacated, and the cause is remanded for findings and entry of an appropriate award on the issue of compensatory damages only.

Affirmed in part, vacated in part, and remanded.

Judges HEDRICK and JOHNSON concur.