IN THE MATTER OF: C.D.L-H, C.L.O.L-H.
No. COA06-1262
North Carolina Court of Appeals
Filed February 20, 2007
This case not for publication
Mercedes O. Chut and Michael K. Newby, for petitioner Guilford County Department of Social Services.
Thomas B. Kakassy, for respondent-mother.
Carol Ann Bauer, for respondent-father.
Greg Gorham, for Guardian ad Litem.
LEVINSON, Judge.
Respondents (mother and father) appeal an order terminating their parental rights in C.D.L-H (C.J.). Mother also appeals an order terminating her parental rights in C.L.O.L-H (Cody). We affirm in part and remand.
The pertinent facts may be summarized as follows: At the time of C.J.'s birth, mother was fifteen years of age and was in the custody of the Guilford County Department of Social Services (DSS). In addition, father was eighteen years of age and a high school senior who lived with his mother. C.J. was placed in DSS custody by a non-secure custody order entered on 27 June 2003, and was subsequently adjudicated dependent on 17 July 2003. DSS entered into a 17 July 2003 case plan with mother for ultimate reunification with C.J. DSS case worker Angela Roberson described the central objectives of mother's case plan: (1) participate in counseling; (2) comply with her DSS placement; (3) complete her education; (4) learn effective parenting skills; and (5) provide proper supervision. Of particular concern to Roberson was the need for mother to become stable in her own placements. The initial placement for mother and C.J. in a therapeutic home was "disrupted because [mother] did not want to follow the household expectations." C.J. was then transferred, alone, to a foster home in Guilford County. After a brief stay by mother in the "Children's Home Society," her placement was again disrupted because of her "violence and disrespect to the property of others." Mother then moved in with her godmother for a week and then to her grandmother but she ran away after one day. On 16 March 2004, mother was placed in a group home in Greensboro, and on 27 June 2004 she ran away from that placement. In August 2004, mother was placed with her former stepmother; this placement ended after two weeks.
On 18 August 2004, mother, who was pregnant with her second child Cody, was placed in the Florence Crittenton Maternity Home in hopes of placing C.J. with her before the new year. Within one week of finalizing the plan to reunite mother with C.J., mother "got into a fight . . . and then ran away that weekend." Mother was permitted to return to Florence Crittenton; however, she had difficulty following the home's rules. For example, mother violated curfew and left without permission. Additionally, during a permitted visit to her cousin's home, mother "was out of control." Consequently, when asked to describe mother's compliance with her case plan, Roberson testified that while mother maintained regular visitation with C.J. and cared for him appropriately, she failed to attend school and therapy regularly and cooperate with her placements. Roberson further testified that mother had accumulated several criminal charges including assault on a minor child and misdemeanor larceny.
Mother gave birth to her second child, Cody, who was adjudicated as a dependent juvenile on 9 May 2005. In April 2005, mother had entered into a case plan with Karen Hall of DSS. According to Hall, the main purposes of the new plan were for mother to attain and maintain emotional and residential stability. After Cody's birth, mother moved in with her aunt in High Point on 19 April 2004. During this period, mother was allowed two hour visits with C.J. twice each month. However, when DSS brought C.J. to mother, C.J. "didn't want to go to [her], and called [a DSS worker] `mommy.'" Also during this visit, Cody was sitting in a baby carrier on the hardwood floor and rocked back and forth "very, very fiercely." Hall was concerned that mother would drop Cody as she was holding him on her hip. In response, Hall testified, mother became very upset and made "definite verbal threats" to her. In addition, mother told Hall, "[y]ou better not come around here again." As a result of this incident, Cody was removed from mother's care on an emergency basis "given the inability to control her emotions and behavior with the child on her lap[.]"
Mother moved to a therapeutic foster home in Winston-Salem in August 2005, followed by a similar home in Greensboro. Hall further testified that mother was unable to fully comply with the provisions of any of her case plans or visitation agreements, and that she frequently exhibited "threatening or assaultive behavior[.]" In addition, mother tested positive for the use of marijuana, and had no record of employment at the time of trial in April 2006. The record suggests that mother's disruptive behaviors contributed to her leaving or being removed from twenty-five (25) or more residential placements.
A clinical psychologist, Dr. Michael McCullough, determined that mother has "dramatizing and egotistical characteristics." McCullough ascertained that mother had "considerable problems with anger management and interpersonal relationships." However, McCullough did not conclude that she would forever be an unfit parent, but rather "with age and maturity,[could] be able to parent. . . ." In addition, Dr. Arlana Sims, executive director for Sims Consulting and Clinical Services, Inc. diagnosed mother with oppositional defiant disorder, which includes the display of resentful, spiteful and vindictive behavior. Sims testified that she made progress with mother. However, mother's inability to show for regularly scheduled appointments inhibited her ability to make greater improvements. Respondent-father was identified as C.J.'s putative father soon after his birth. Father, eighteen (18) and mentally retarded, was living at home with his mother. DSS worker Roberson entered into a case plan with father on 11 July 2003. The chief goals of the plan were to ensure that father demonstrate adequate parenting skills, attend parenting classes, maintain regular visitations, and emotionally bond with the child. On 13 April 2004, the case plan was updated to require father to maintain appropriate housing for himself and C.J., procure suitable employment, and comply with random drug tests.
Roberson testified that father completed some parenting classes by December 2004. However, Roberson informed father that his home was not appropriate because certain safety hazards existed, such as exposed electrical outlets and improperly stored medication. Roberson further testified that father failed to come forth with proof of employment. While father was "appropriately affectionate with the child", Roberson observed C.J. playing with a "laser light pointer."
During 2004 and 2005, DSS permitted father to visit with C.J. However, father failed to maintain regular contact with DSS and failed to attend scheduled visits with C.J. on 2 February 2004 and 17 March 2004. In addition, a supervised visit scheduled for 29 June 2005 was terminated after one half hour because C.J. was "screaming" and father was unresponsive to his "emotional outburst." Father failed to appear for a visit 15 July 2005, but appeared for a supervised visit 2 September 2005. At the time of trial, father had not seen C.J. for approximately seven months. DSS also attempted to schedule a psychological evaluation for father, which required him to attend three sessions; father appeared for only two sessions. DSS worker Karen Hall testified that father has not "made any progress in any area of the case plan."
Father testified that he does have a high school diploma and was unemployed. Father further testified that he knew that he was "messing up." In response to the inquiry on direct examination, as to why he had not visited C.J. recently, father stated that he didn't "feel that an hour will give me more bond with my child. A[n] hour, like one time a week, it wouldn't give me more bond with my child."
In an order filed on 7 July 2006, the trial court terminated mother and father's parental rights in C.J. based upon its conclusions of neglect, willfully leaving the child in foster care for more than 12 months, and willfully failing to pay a reasonable portion of child support. In a second order also filed on 7 July 2006, the trial court terminated mother's parental rights in Cody based upon its conclusions of neglect and willfully leaving the child in foster care for more than 12 months. From these orders, mother and father now appeal.
A court's termination of parental rights is a two-step process: there is an adjudicatory stage to the proceeding under N.C. Gen. Stat. § 7B-1109 (2005), and a dispositional stage under N.C. Gen. Stat. § 7B-1110 (2005). In re Howell, 161 N.C. App. 650, 656, 589 S.E.2d 157, 160-61 (2003). During the adjudication stage, the trial court determines whether clear, cogent, and convincing evidence exists to support at least one of the grounds for termination under N.C. Gen. Stat. § 7B-1111 (2005). In re Shepard, 162 N.C. App. 215, 221, 591 S.E.2d 1, 5 (2004) (citations omitted). "The clear, cogent and convincing evidentiary standard is a greater standard than the preponderance of the evidence standard, but not as rigorous as the proof beyond a reasonable doubt requirement." In re Yocum, 158 N.C. App. 198, 203, 580 S.E.2d 399, 403 (2003) (citing In re Montgomery, 311 N.C. 101, 109-10, 316 S.E.2d 246, 252 (1984)). If supported by clear, cogent and convincing evidence, "[a] trial court's findings of fact are deemed conclusive, even where some evidence supports contrary findings[.]" In re Smith, 146 N.C. App. 302, 304, 552 S.E.2d 184, 186 (2001). "The trial judge determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, [the trial court] alone determines which inferences to draw and which to reject." In re Hughes, 74 N.C. App. 751, 759, 330 S.E.2d 213, 218 (1985).
Where such evidence is present, the court moves to the dispositional stage, and it considers whether terminating parental rights would be in the best interest of the child. Howell, 161 N.C. App. at 656, 589 S.E.2d at 161 (citation omitted). This Court has described the standard of review for termination of parental rights cases as:
whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law. We then consider, based on the grounds found for termination, whether the trial court abused its discretion in finding termination to be in the best interest of the child.
Shepard, 162 N.C. App. at 221-22, 591 S.E.2d at 6 (internal quotation marks omitted).
In mother's sole argument on appeal, she contends that since she was a minor (15 years of age) at the commencement of the termination proceedings, she lacked the necessary capacity to have willfully left C.J. and Cody in foster care for more than 12 months pursuant to N.C. Gen. Stat. § 7B-1111(a)(2)(2005). We disagree.
This Court has articulated that in order:
to sustain the trial court's finding that grounds existed for termination of parental rights under G.S. § 7B-1111(a)(2), we must also determine that there was clear, cogent, and convincing evidence that (1) respondents "willfully" left the juvenile in foster care for more than twelve months, and (2) that each respondent had failed to make reasonable progress in correcting the conditions that led to the juvenile's removal from the home.
In re Baker, 158 N.C. App. 491, 494, 581 S.E.2d 144, 146 (2003) (citing In re Bishop, 92 N.C. App. 662, 667, 375 S.E.2d 676, 680 (1989)). "Evidence showing a parents' ability, or capacity to acquire the ability, to overcome factors which resulted in their children being placed in foster care must be apparent for willfulness to attach." In re Matherly, 149 N.C. App. 452, 455, 562 S.E.2d 15, 18 (2002) (citation omitted).
In Matherly, which concerned a minor parent, this Court concluded the trial court's findings of fact were inadequate as to mother's willfully leaving the juvenile in foster care because there was no finding that she was legally able to establish her own residence. Id. By doing so, this Court expressed a concern that minor parents' age-related limitations be considered when evaluating "willfulness" pursuant to G.S. § 7B-1111(a)(2). In In re J.G.B., ___ N.C. App. ___, ___, 628 S.E.2d 450, 457 (2006), this Court recently held that the trial court did not make sufficient age-related findings as to the minor mother, considering that mother's living in the same foster home as her child did not "necessarily constitute[] willfully leaving the child in foster care."
In the instant case, the trial court made findings which illustrated that mother's age-related limitations were sufficiently considered. The following unchallenged findings of fact were included in the termination order concerning each child:
23. The Court notes that both therapists indicate[d] that the mother was intelligent and had a clear perspective of her anger issues and how her behaviors were affecting her life but did not translate this knowledge into more controlled behavior. . . .
. . . .
25. Further, the Court finds as fact that the mother has psychological diagnoses, both therapists and the psycholigist who conducted her parenting assessment, indicated she was capable of understanding her mental health issues and how they impacted a lot on her life and also, she possessed the ability to address these problems when she was determined to do so.
These findings of fact and others in the trial court's orders demonstrate that mother had the ability to comply with the case plans, and that the court considered her age-related limitations. And, very significantly, the trial court here did not focus on mother's ability or inability to maintain her own residence _ something distinguishing this Court's concerns in Matherly and J.G.B. T he relevant assignments of error are overruled.
Mother challenges not only the conclusion of law that grounds existed to terminate parental rights pursuant to G.S. § 7B-1111(a)(2) (reasonable progress), but additional ones. However, we need not address the other grounds, as only one ground is needed to support termination of parental rights. In re Stewart Children, 82 N.C. App. 651, 655, 347 S.E.2d 495, 498 (1986).
We next address father's arguments on appeal. In father's first argument, he challenges findings of fact 31, 33, 34, 35 and 36 as unsupported by clear, cogent and convincing evidence . As an initial matter, "[w]e note that, `[i]f [a] finding of fact is essentially a conclusion of law . . . it will be treated as a conclusion of law which is reviewable on appeal.'" Smith v. Beaufort County Hosp. Ass'n., 141 N.C. App. 203, 214, 540 S.E.2d 775, 782 (2000) (quoting Bowles Distributing Co. v. Pabst Brewing Co., 69 N.C. App. 341, 344, 317 S.E.2d 684, 686 (1984)). Accordingly, as "findings" 34, 35, and 36 essentially conclude that grounds to terminate were satisfied with respect to G.S. §§ 7B-1111(a)(1), (a)(2) and (a)(3), we will treat them as such.
Finding of fact 31 provides:
The Court finds that [father] has not complied with several key provisions of his case plan. In particular:
a. He has not obtained adequate housing, but still resides with his mother; this is not an appropriate placement for the juvenile due to a previous Child Protective Services history;
b. He has not obtained employment or provided verification of his employment efforts or inability to become employed, although he did initially attend some sessions at Vocational Rehabilitation, which found that he did not qualify for their services;
c. He has not maintained contact with the Department of Social Services or cooperated with their attempts in assisting him in completing their parenting assessment. Moreover, he had not attended the final scheduled parenting assessment session, although it has been rescheduled for him on numerous occasions;
d. He has not provided adequate supervision for the juvenile during visitation, and has in fact, not visited with the child since August 3, 2004, although visitation was available to him;
e. Although completing parenting classes, during his limited visitation, he has not demonstrated effective parenting skills;
f. He has not demonstrated significant bonding with the juvenile during his visits;
g. He has not completed his parenting assessment despite numerous rescheduling by the Guilford Center and several attempts by the Department of Social Services to assist him in completing the sessions, and thereby, not cooperated in the assessment of his strengths and needs as a parent;
h. He has not provided financial support for the minor child, although he does receive a Social Security check.
With the exception of a portion of paragraph 31d, discussed below, paragraph 31 is supported by clear, cogent and convincing evidence. DSS workers Roberson and Hall testified that father never moved out of his mother's home. DSS had a record of safety hazards in father's residence such as improperly stored medication and exposed electrical outlets; these deficiencies were never corrected. Roberson also testified that father never provided proof that he was ever employed. Hall testified that she had contact with father on only two occasions. Crystal Allen, a court liaison for the Guilford County Mental Health Center, testified that she tried to schedule a mental health parenting evaluation several times, but father missed three appointments and attempted to schedule the final appointment in the evaluation series five times. Allen further testified that one appointment was rescheduled because of father's inattentiveness. There was also evidence presented that father did not properly supervise C.J.; indeed, one visit was terminated because father was unable to deal with C.J.'s "screaming." The record also reveals a lack of bonding between C.J. and father due, in part, to father's failure to regularly maintain contact with C.J. Roberson also testified that father did not provide financial support to C.J., despite his receipt of a Social Security check.
We conclude that the portion of paragraph 31d that states father had "not visited with the child since August 3, 2000" is not supported by the record. On the contrary, Hall also testified that father did not visit with C.J. from 2 September 2005 until 24 April 2006, despite phone messages and letters Hall sent to father. As a result, we remand this matter to the trial court to make this correction. We next consider whether finding of fact 33 is supported by sufficient competent evidence. That paragraph provides:
Further, the Court finds that respondent father used his mental limitations as justification for non-compliance, however, since there is no evidence to the extent of his mental limitations, and since he did not comply with the parenting assessment that would have measured his mental abilities, the Court is not able to determine that his non-compliance was justified by his limitations. However, the Court does find that the Department of Social Services did attempt to assess his limitations without success due to his non-cooperation.
Allen testified that she attempted to arrange an IQ test, but father did not fully participate in the assessments. The relevant parenting and IQ assessments were an integral step in establishing a case plan that would meet the needs of C.J. and father. We also observe that much of the evidence that supports finding of fact 31 also helps to support finding of fact 33. Hence, as findings 31 and 33 are supported by clear, cogent and convincing record evidence, the relevant assignments of error are overruled.
Father contends that the trial court's findings do not support the court's conclusion of law that father neglected C.J.
According to G.S. § 7B-1111(a)(1), a court may terminate one's parental rights where:
The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.
"Neglect", in turn, is defined as follows:
Neglected juvenile. A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
N.C. Gen. Stat. § 7B-101(15) (2005).
In a termination of parental rights proceeding based on neglect, the trial court must determine whether neglect is present at the time of the termination proceeding. In re Ballard, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984). If a juvenile should ever be removed from the parent before the date of the termination hearing "evidence of neglect by a parent prior to losing custody. . . is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." Id. at 715, 319 S.E.2d at 232 (citation omitted). The probability of a repetition of neglect must also be shown by clear, cogent and convincing evidence. In re Young, 346 N.C. 244, 250, 485 S.E.2d 612, 616 (1997).
In the instant case, the findings of fact adequately support the trial court's conclusion that father neglected C.J. For example, father failed to attain suitable housing for himself and C.J.; did not secure employment; and did not complete the requisite parental training and psychological assessments. Father failed to visit with C.J. for seven months at the time the termination hearing began. See In re Davis, 116 N.C. App. 409, 414, 448 S.E.2d 303, 306 (1994) (the parents' failure to "obtain [ ] continued counseling, a stable home, stable employment, and [attend] parenting classes" was sufficient to show a probability that neglect would be repeated if the child were returned to the care of the parents); In re Apa, 59 N.C. App. 322, 324, 296 S.E.2d 811, 813 (1982) ("Neglect may be manifested in ways less tangible than failure to provide physical necessities. . . . [T]he trial judge may consider . . . a parent's complete failure to provide the personal contact, love, and affection that inheres in the parental relationship."). Accordingly, the trial court did not err in concluding that grounds existed to terminate respondent father's parental rights based on neglect. The relevant assignments of error are overruled.
Because we have sustained one of the grounds for termination, we need not review the remaining grounds for termination. In re Stewart Children, 82 N.C. App. at 655, 347 S.E.2d at 498.
In father's final argument on appeal, he contends that the trial court erred by concluding that the termination of his parental rights in C.J. was in C.J.'s best interests. We disagree.
We review the trial court's conclusion that a termination of parental rights would be in the best interest of the child on an abuse of discretion standard. In re V.L.B., 168 N.C. App. 679, 684, 608 S.E.2d 787, 791, disc. review denied, 359 N.C. 633, 614 S.E.2d 924 (2005). "Abuse of discretion exists when `the challenged actions are manifestly unsupported by reason.'" Barnes v. Wells, 165 N.C. App. 575, 580, 599 S.E.2d 585, 589 (2004) (quoting Blankenship v. Town and Country Ford, Inc., 155 N.C. App. 161, 165, 574 S.E.2d 132, 134 (2002)).
Here, the findings and conclusions illustrate significant parenting deficiencies on the part of father, who has failed to demonstrate a real and sustained commitment to C.J. We conclude that the trial court's conclusion that terminating father's parental rights in C.J. was in the best interests of C.J. is not manifestly unsupported by reason. This assignment of error is overruled.
Affirmed in part and remanded.
Chief Judge MARTIN and Judge McCULLOUH concur.
Report per Rule 30(e).