IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-343

No. COA20-675

Filed 20 July 2021

Yadkin County, Nos. 18 JA 57, 18 JA 58

IN THE MATTER OF: B.R.W., B.G.W.

Appeal by respondent-mother from order entered 27 March 2020 by Judge Jeanie R. Houston in District Court, Yadkin County. Heard in the Court of Appeals 9 March 2021.

*James N. Freeman, Jr,. for petitioner-appellee.*

*J. Thomas Diepenbrock, for respondent-appellant-mother.*

*Paul W. Freeman, Jr., for Guardian ad Litem.*

STROUD, Chief Judge.

¶ 1     Mother appeals a permanency planning review order awarding guardianship of her daughters to their paternal grandmother. Mother argues that the trial court's determination that she was unfit and acted in a manner inconsistent with her constitutionally protected status was not supported by clear and convincing evidence and, therefore, the trial court erred by applying the "best interest of the child" standard in its custody determination. Mother also challenges the evidentiary support for several of the trial court's findings of fact and conclusions of law.

Because the trial court's determination that Mother acted in a manner inconsistent with her constitutionally protected status was supported by clear and convincing evidence, making the "best interest of the child" standard applicable, we affirm that portion of the permanency planning order. The trial court's determination that Mother was unfit, however, was not supported by clear and convincing evidence, and we reverse that portion of the order.

## I.    Background

On 1 May 2018, the Yadkin County Human Services Agency ("DSS") received a Child Protective Services report alleging that Brittany and Brianna,[1] ages four and seven at the time, were at home when their intoxicated father ("Father") began "busting plates and throwing glasses[.]" Brittany and Brianna lived in a house with Father, Father's mother ("Grandmother"), and Father's grandmother ("Great Grandmother"). Grandmother removed Brittany and Brianna from the house and called law enforcement. Father[2] was arrested, cited for a probation violation, charged with resisting a public officer and drunk and disorderly conduct, and scheduled to appear in court on 27 June 2018. On 14 June 2018, DSS filed a juvenile petition alleging that Brittany and Brianna were neglected juveniles in that they "live[d] in an environment injurious to [their] welfare." The trial court approved the children's

---

[1] Pseudonyms are used.
[2] Father is not a party in this appeal.

relative placement with Grandmother and Great Grandmother.

¶ 4 Following a 25 June 2018 hearing, the trial court entered an order finding that Mother lived in Alexander County with her husband ("Stepfather"), who had "an extensive criminal history including drug-related convictions, assault on a female, larceny, and multiple DWIs." Following her separation from Father in 2015, Mother had "occasionally visited" with her daughters at Father's home or family gatherings, but the court found that Mother had "not made decisions regarding the minor children's education or welfare, contributed financially to their support and maintenance, or otherwise filled the role of parent/caretaker of the minor children[.]" The trial court directed DSS to coordinate with Alexander County to conduct a home study on Mother's home in order "to assess whether it is a suitable and appropriate placement for the minor children" and awarded "bi-weekly visitation, lasting at least one hour per visit, contingent upon the parents not being incarcerated."

¶ 5 On 13 July 2018, Mother and Stepfather each entered an Out of Home Family Services Agreement ("OHFSA") with DSS which required: completion of psychological assessments and any resulting recommendations; participation in substance abuse assessments and any resulting recommendations; submission to random drug screens; completion of a parenting education program; and demonstration of stable employment.

¶ 6        On 31 August 2018, the trial court entered an Adjudication and Dispositional Order which adjudicated the children neglected. The written order found that Mother and Stepfather had been participating in biweekly telephone conversations and had visited with the children on "multiple" occasions. Although the trial court noted "the fact that a significant period of time ha[d] elapsed since [Mother] ha[d] been involved in the lives of the minor children on a regular basis[,]" the court found that Mother still appeared to have "some bond" with her daughters. Mother was given "a minimum of biweekly visitation, for at least one hour per visit . . . with [DSS] having the discretion to increase the duration and frequency of visitation." The trial court established a primary permanent plan of reunification and a secondary plan of guardianship.

¶ 7        Mother informed the Alexander County Department of Social Services on 16 August 2019 "that her landlord [was] selling their mobile home and they [were] going to be forced to move. She stated, 'I don't know how we are going to do this' in regards [sic] to completing the home study." Subsequently, citing concerns regarding the lack of stable housing and Stepfather's criminal history, the Alexander County Department of Social Services denied Mother and Stepfather's home study on 29 August 2018.

¶ 8        In a 90 Day Review Order entered on 6 December 2018, the trial court found that Mother was in compliance with many requirements of her OHFSA: she was

employed, had access to transportation, found a temporary residence in Thurmund, North Carolina, maintained regular contact with DSS, submitted to random drug screens at DSS's request, and completed a psychological evaluation. However, Mother had "not completed a substance abuse assessment" or "a parenting education program[.]" Stepfather had completed a psychological assessment and was "regularly attending visitation" with the children, maintaining communication with DSS, and submitting to random drug screens, but the trial court found that Stepfather was not employed "due to a back injury" and, like Mother, had not completed a substance abuse assessment or a parenting education program. Finding that Mother "consistently visited" with her daughters, the trial court awarded Mother "a minimum of biweekly visitation, for at least one hour per visit . . . with [DSS] having the discretion to increase the duration and frequency of visitation and to allow unsupervised visitation." The permanent plan remained reunification with a secondary plan of guardianship.

¶ 9        Prior to the 16 May 2019 permanency planning hearing, DSS filed a report noting that Mother had "been working diligently on her OHFSA" and Stepfather had "made substantial progress on his OHFSA[.]" The DSS report indicated that Mother and Stepfather had been participating in unsupervised visitation with the children on Sundays from 12:00 p.m. to 6:00 p.m. and had been taking the children to church on the last Sunday of each month. Mother was in compliance with the terms of her

child support order and "ha[d] sent extra money to pay down her arrears on her own." Noting that Mother and Stepfather had made "substantial progress" on their respective OHFSAs, DSS recommended the children remain in their placement with Grandmother and Great Grandmother, as "[p]arenting classes need to be completed and the home is not yet ready to house the children." DSS recommended that "overnight visits [with Mother and Stepfather] begin at the discretion of the agency[.]"

¶ 10        In a report revised on 3 May 2019, the guardian ad litem ("GAL") reported that she witnessed Stepfather "become increasingly angry" with social workers before "storming out mad" and demanding Mother follow at a 26 April 2019 Child and Family Team meeting. The GAL expressed her "extreme . . . concern . . . about the safety of the girls, as well as [Mother] after this display" as well as her concern

> that a primary desire for [Mother] and Stepfather . . . for gaining custody of the girls involves regaining the multiple $thousands [sic] tax refund that comes along with them. When [Mother] left 3 years ago, she threatened [G]randmother . . . that she would take the girls if [Father] and [Grandmother] didn't allow her and [S]tepfather to claim the girls for tax refunds even though they did not live with them. This went on for 3 years prior to the current [DSS] issue. This was the first year [Mother] and Stepfather did not receive that money. Grandmother . . . told GAL she only cares about keeping peace and making sure the girls are safe.

The GAL recommended Stepfather be assessed for "domestic violence and anger issues" and Mother "be assessed for effects of domestic violence."

On 16 July 2019, the trial court entered a permanency planning order finding that Mother and Stepfather's home in Thurmond was "safe and appropriate for the minor children." The court found Mother was an "active participant" in her parenting classes and her parenting educator reported that she was "implementing the lessons she [was] learning during her interactions with the minor children." Mother's visitation remained unchanged except that DSS was "given the discretion to implement overnight visitation[,]" and the primary plan remained reunification with a secondary plan of guardianship. The trial court directed Mother and Stepfather to participate in domestic violence assessments.

On 13 July 2019, the children began overnight visitation with Mother at Stepfather's mother's two-bedroom house. The GAL reported that Mother and the children slept in one bedroom, Stepfather's mother slept in one bedroom, Stepfather slept on the recliner in the living room, and Stepfather's uncle slept on the couch. DSS reported that Mother had "completed all objectives on her OHFSA[,]" and "recommended that a Trial Home Placement begin immediately" with Mother and Stepfather. DSS recommended a primary plan of reunification with a concurrent plan of guardianship.

On 23 August 2019, the doctor who conducted the anger and domestic violence assessments on Mother and Stepfather wrote "after a very extensive domestic violence evaluation of both individuals and an anger management assessment of the

husband plus having interviewed the couple separately and together, there is no indication of any domestic violence or anger issues." On 3 September 2019, the children began weekend visitation with Mother and Stepfather.

¶ 14 The permanency planning hearing was continued until 26 September 2019 "[t]o allow [M]other to have stable housing"; the trial court indicated on the continuance order it was Mother's "last continuance." The GAL stated in a report revised on 17 September 2019 that Mother was working and had transportation; however, her home was "not appropriate for full time care of the girls." Stepfather was "on crutches after being injured in a fall" and "continue[d] to try to qualify for disability payment, which he was also attempting prior to his injury." The GAL further reported:

> [Mother] and Step[father] are living with Step[father's] . . . mother in Wilkes County. They have said they are looking for a home for themselves and the girls but have made no progress in a year. [Mother] has told GAL she doesn't want to take [Brianna] out of the Jonesville school district "because she loves it so much" but there is no evidence they have looked in Jonesville. [Mother] told GAL she could bring the girls to Jonesville school on her way to work, but this is a different county.

The GAL noted the following other "issues for the court's attention": Brittany told the GAL, and Mother confirmed, she and Brianna had ridden in the back bed of Stepfather's pickup truck; Mother was late picking the children up from school on a Friday and the following Monday, Brittany complained of a headache and Brianna's

teacher reported that Brianna would not sit down at her desk and would not work; Brittany told the GAL that Stepfather "said from now on he would be sleeping in the bed with [Mother] rather than on the recliner and they could sleep at the bottom of the bed[;]" and Mother collected tax refunds of at least $7,000 for at least three years despite not providing for the children's primary care and now "continues the girls' lifelong pattern of pushing responsibility for the children off on the grandmother." The GAL indicated she did not believe it was possible for the children to be returned to their parents within a reasonable period of time:

> The children have been in [DSS] custody for over a year now and overnight visits only began in July with [Mother], even though her housing is inadequate, and [Stepfather] is not working. Father should be returning home from prison soon and will have to get back on his feet. It seems very unlikely that either parent can be responsible for the girls without support from their own parents. It is in the best interest of the children that someone more dependable has legal custody, while still allowing them to have [a] relationship with their parents.

The GAL recommended the permanent plan be "Custody/Guardianship to [G]randmother[.]"

¶ 15      Following a 26 September 2019 hearing, the trial court entered a permanency planning consent order on 6 November 2019. The trial court found that Mother was compliant in her OHFSA except in terms of housing; specifically, the two-bedroom home where Mother resided with Stepfather was "occupied by no less than four adults

and lack[ed] sufficient space for the minor children to return to on a permanent basis under these circumstances." The trial found that Stepfather, who was also in compliance with his OHFSA except in terms of housing and employment, was unemployed "due to a back injury" and was "seeking disability benefits." Additionally, the trial court found that Mother and Stepfather had completed domestic violence assessments. The trial court concluded that "in light of [Mother and Stepfather's] near-completion of their OHFSAs, it is likely the minor children can be returned home within the next six months." The permanent plan remined reunification with a secondary plan of guardianship.

¶ 16    On 21 November 2019, DSS filed a "Motion for Review" for each child, "requesting a permanency planning hearing" be held on 5 December 2019 "for finalizing and obtaining permanency[.]" The motions reflected DSS's revised recommendation that the trial court award guardianship of Brittany and Brianna to Grandmother. The 5 December 2019 hearing was continued to 2 January 2020; the 2 January 2020 hearing was continued to 16 January 2020.

¶ 17    Before the hearing, DSS revised a report it had prepared on 17 December 2019. DSS reported that Brittany, in third grade at the time,

> [h]as displayed some attachment and adjustment issues after weekend visitation with her mother. [Brittany] is having transition issues on Mondays at school once she had spent the weekend with [Mother]. The school guidance counsel, the principle [sic] and her therapist Amber Dillard

> have reported issues with school transitions on Monday's and lasting all day. [Brittany's] cry's [sic] and asked for her grandmother and is sad until time to be picked up. When [Brittany] is ask [sic] what is wrong she states she misses her grandmother and wants to be with her. [Brittany] has stated to [DSS] at the last couple of home visits, and at a permanency planning meeting, that she wanted to live with her grandmother and visit with her mother.

DSS reported that Brianna, who had started kindergarten, had also "displayed some attachment and adjustment issues after weekend visitation with her mother" and was seeing a therapist "for her transition issues but does not talk a lot." Based on the new information, DSS recommended:

> due to the continued statements and reports from other professionals, that [Brittany] has made in regards to waning [sic] to remain in her grandmother['s] home [DSS] is requesting that Guardianship of both girls be granted to [Grandmother] on this date and that [DSS] be released of any further efforts.

However, DSS's report also provided: "[i]t is possible for the children to be returned to the care of their mother within the next six months. [Mother and Stepfather] have completed their OHFSA. [Mother and Stepfather] have been doing weekend and overnight visits also."

¶ 18    In preparation of the 16 January 2020 hearing, the GAL issued an updated report stating, "[b]oth girls are having very concerning emotional problems that seem to be tied to their weekend visits with their mom and stepfather." Specifically, the GAL noted that Brittany's "teacher said [Brittany] is often so distraught on Monday

mornings that she cannot focus on classwork and often breaks into tears[;]" however, "[w]hen asked about this, [Brittany] told [the] GAL she likes seeing her mother but misses her grandmother." Likewise, Brianna's "teacher reported that after weekend visits, [Brianna] would not sit down at her desk to work and also wouldn't talk. This is unusual behavior for her." The GAL reported that "[b]oth girls say they want to live with their paternal grandmother and great-grandmother" and, according to Brittany, Mother "'pays more attention to [Stepfather] than to [them]' and 'sometimes doesn't even talk to' them." The GAL also addressed her concerns about the children riding in the back bed of Stepfather's pickup truck and opined that it was *not* possible for the children to be returned to Mother within a reasonable time:

> The children have been in [DSS] custody for over a year now and overnight visits only began in July with [Mother]. After these visits, the girls exhibit extreme emotional distress. On at least two occasions – involving the girls riding in the back of the pickup truck, and involving the Step[father's] sleeping on the couch rather than the bedroom – [Mother] was less than forthcoming about what was happening in her home and only discussed it after one of the children told their GAL. Because of this, GAL has concerns about [Mother] putting the girls' best interest [sic] above her husband's.
> Their father is only recently released from prison and is not yet on his feet with either employment or housing.
> In addition, the girls' primary care bond is to their grandmother, who has essentially raised them their entire lives. Even when their mother and father were married, they lived with their grandmother. When [Mother] left 3-4 years ago, she only visited sporadically, and often only for

an afternoon.

It is in the best interest of the children that they remain in their current home, where they are most secure – their grandmother's.

¶ 19　The 16 January 2020 hearing was continued to 30 January 2020 "to allow time to review [the] new court report." In preparation for the hearing, DSS issued a report recommending the following:

> [DSS] recognizes that [Mother] has completed all requirements of her OHFSA. However, while the children do have a bond with [Mother], their bond and connection is primarily with their grandmother . . . . Both [Brittany and Brianna] primarily have always resided with their grandmother who has provided the most stability and consistency regarding their care and supervision. [Mother] was absent from the children's lives for approximately three years (prior to the children coming into foster care) and during this time the children were cared for by their paternal grandmother.
> The children have continued to make statements to their social worker, GAL, and other professionals that they wish to reside with their grandmother but have visits with their parents. [DSS] is requesting that Guardianship of both girls be granted to [Grandmother] on this date and that the agency be released of any further efforts.

¶ 20　On 30 January 2020, the trial court held the permanency planning review hearing that is the subject of this appeal. At the hearing, Grandmother testified that she had lived with the children, whom she described as her "life," for the entirety of their lives. Grandmother explained that Mother, despite residing in the same county as her daughters for approximately three years, only visited the children on holidays

and birthdays; however, Mother still claimed the children as dependents on her tax returns.

¶ 21      Mother testified that she and Stepfather had recently moved into a three-bedroom, two-bathroom, house and that she was working full time. She explained that she left the children in 2013 because Father "was back doing drugs, drinking" but, after she left, she saw her daughters "a lot more than what was said." Mother claimed that in the years before she started officially paying Grandmother child support, she had given Grandmother $2,000 to $3,000 in financial assistance, and she denied claiming the children as dependents on her tax returns. Mother testified that she had completed a parenting class, psychological exam, anger management classes, and "everything that they told [her] to go through." She explained that for approximately five months, she had been picking the children up from school every Friday, taking them to church on Sunday, and dropping them back off at school Monday morning. She testified to her "great" bond with her daughters, explaining that they all "have a ball" together. Mother "just want[ed] to make it clear" that she had "been there" for her "girls and [she] love[s] them."

¶ 22      DSS social worker Steven Corn testified that one reason DSS's primary plan recommendation changed from reunification to guardianship was Brittany's statements to DSS and other professionals "that she has a bond with her mother, but she feels more secure with her grandmother[.]" Mr. Corn testified that the children's

therapist relayed to him that "it was very hard on Monday mornings at school for the girls to readjust" and "sometimes those transition episodes would last into maybe Tuesday also." The trial court announced its decision to award guardianship of the children to Grandmother and award Mother visitation every other weekend from Friday to Sunday, in hopes of alleviating the children's Monday transition issues.

On 27 March 2020, the trial court entered a permanency plan review order finding that Mother was unfit and had acted in a manner inconsistent with her constitutionally protected status and concluding that "the best interest of the minor children, [Brittany and Brianna], would be served by awarding guardianship to [Grandmother]." In addition to awarding visitation every other weekend, Mother was also given "unsupervised visitation as she and [Grandmother] can mutually agree." The order decreed that "[a]ny party may file a motion for review at any time upon proper notice to all parties." Mother appeals.

## II.    Standard of Review

Our review of a trial court's permanency planning review order "'is limited to whether there is competent evidence in the record to support the findings [of fact] and whether the findings support the conclusions of law.'" *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013) (alteration in original) (quoting *In re P.O.*, 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010)). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *Id.* (citation omitted).

"[W]e review [a] conclusion [that the natural parent's conduct was inconsistent with her constitutionally protected right] de novo, and determine whether it is supported by 'clear and convincing evidence.'" *Boseman v. Jarrell*, 364 N.C. 537, 549, 704 S.E.2d 494, 502 (2010) (citation omitted).

## III. Findings of Fact

Mother argues that several of the trial court's findings of fact were not supported by clear and convincing evidence[3] and/or were based on a misapplication of the law.

Mother raises several arguments regarding finding of Fact #24:

> 24. The Court finds requiring the children to live with the mother and step-father is not in their best interest and is contrary to their health, safety and welfare. Therefore it is not possible for the children to be reunified to the mother's home immediately or within the next six months.

Mother argues the portion of Finding of Fact #24 stating "it is not possible for the children to be reunified to the mother's home immediately or in the next six months" is not supported by the evidence because it is contrary to DSS's court reports.[4] Mother points to the language of DSS's 17 December 2019 report, entered

---

[3] Contrary to Mother's assertion, this Court reviews whether the trial court's findings of fact were supported by competent evidence, not clear and convincing evidence. *See In re L.M.T.*, 367 N.C. at 168, 752 S.E.2d at 455.

[4] The first sentence of this finding is a conclusion of law, as noted by the dissent, and thus Mother's argument as to the conclusion of law is addressed separately below.

into evidence and incorporated in the permanency planning order, which states that "[i]t is possible for the children to be returned to the care of their mother within the next six months." However, the GAL offered a contrary opinion, indicating in her report she did "not believe" it was possible for the children to be returned to Mother's home within a reasonable time. The trial court is the sole judge of the weight and credibility of the evidence, and even if there is contrary evidence, the trial court's finding is supported by the evidence presented by the GAL, as well as by other evidence regarding Mother and Stepfather. *See In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). Thus, that portion of Finding of Fact #24 is supported by competent evidence.

¶ 28        Mother argues the portion of Finding of Fact #24 that a return to her home would be contrary to the children's health, safety, and welfare was not supported by clear and convincing evidence, given Mother and Stepfather's compliance with their respective case plans and the trial court allowing them unsupervised visitation with the children. Similarly, Mother challenges Finding of Fact #30:

> 30. At this time reunification efforts clearly would be unsuccessful and/or would be inconsistent with [Brittany] and [Brianna's] health or safety and need for a safe, permanent home within a reasonable period of time.

She argues that "[g]iven that [she] and her husband had completed their case plan and were deemed by the trial court to be able to provide proper care and supervision

in their home, since they were awarded unsupervised visitation, this finding is not supported by clear and convincing evidence." Although Mother did complete most of her OHFSA, the evidence shows that she did not fulfill the provision she find housing adequate for the children until right before the 30 January 2020 permanency planning hearing – approximately nineteen months after Mother entered into her OHFSA and over 50 months after she left the children with Grandmother to find "stable" housing. In addition to the concerns about Mother's home, DSS and the GAL stated in their respective reports that Brittany and Brianna struggled with adjustment issues at school on Mondays following weekend visitation with Mother. Both children also expressed their preference to live with Grandmother and visit with Mother. Although the children's preferences are not controlling, the trial court may consider their preferences along with the other evidence. *See Reynolds v. Reynolds*, 109 N.C. App. 110, 112–13, 426 S.E.2d 102, 104 (1993) ("The 'paramount consideration' in matters of custody and visitation is the best interests of the child, and in determining such matters the trial judge may consider the wishes of a child of suitable age and discretion. The child's wishes, however, are never controlling, 'since the court must yield in all cases to what it considers to be the child's best interests, regardless of the child's personal preference.'" (citations omitted)). Thus, competent evidence in the record supports the trial court's finding that placing the children in Mother's home would be contrary to their health, safety, and welfare.

¶ 29        Mother argues the conclusion of law included within Finding of Fact #24 that requiring the children to return to Mother's home would be contrary to their best interests is based on a misapplication of the law given that the "best interest of the child" standard is inapplicable. Similarly, Mother asserts that Finding of Fact #43 (best interest of children served by awarding guardianship to Grandmother) "is based on a misapplication of law, given that the best interest standard is inapplicable, since the finding that [Mother] is unfit and has acted in a manner inconsistent with her constitutionally-protected status is not supported by clear and convincing evidence." It has been long established in North Carolina that "[o]nce a court determines that a parent has actually engaged in conduct inconsistent with the protected status, the 'best interest of the child test' may be applied without offending the Due Process Clause." *Owenby v. Young*, 357 N.C. 142, 146, 579 S.E.2d 264, 267 (2003) (citation omitted). Thus, this argument is not really a challenge to a finding of fact but instead is a challenge to the trial court's conclusion of law that Mother acted in a manner inconsistent with her constitutionally protected status and was unfit. We will address Mother's arguments regarding these legal conclusions below.

¶ 30        Finally, Mother argues that Findings of Fact #35 (that guardianship is the best permanent plan for the children) and #43 (that awarding guardianship to Grandmother is in the best interest of the children) are conclusions of law, not findings of fact. This Court has held "[i]f the finding of fact is essentially a conclusion

of law, . . . it will be treated as a conclusion of law which is reviewable on appeal." *Bowles Distrib. Co. v. Pabst Brewing Co.,* 69 N.C. App. 341, 344, 317 S.E.2d 684, 686 (1984). Again, both of these "findings" present issues more appropriately considered as part of our discussion of Mother's challenges to the trial court's conclusions regarding acting inconsistently with her parental rights and her fitness, and we will address them below. Thus, the trial court's substantive findings of fact are supported by competent evidence and are binding on appeal.

## IV. Acting in a Manner Inconsistent with Constitutionally Protected Status

¶ 31 Mother contends that the trial court's finding she was unfit and had acted in a manner inconsistent with her constitutionally protected status as a parent is unsupported by evidence and is contrary to the trial court's other findings of fact. Mother's argument challenges Finding of Fact #34:

> 34. The Court finds the mother and the father by clear and convincing evidence are unfit to provide for [Brittany] and [Brianna's] needs and have acted in a manner inconsistent with their constitutionally protected status as a parent. [Brittany] and [Brianna] have been in non-secure custody for 19 months. The mother has completed her family service case plan but the children have, since birth, resided in the home of [Grandmother] and wish to remain there. The mother has not resided with the girls for now five years. The father is incarcerated again and has not completed a family services agreement.

¶ 32 We first note that although the trial court's Finding of Fact #34 includes both factual findings and conclusions of law, Mother does not challenge the last four

sentences of Finding of Fact #34 which are actually findings of fact. Mother challenges only the first sentence of Finding of Fact #34, which presents two conclusions of law. The first sentence of this finding treats unfitness and acting inconsistently with constitutionally protected rights as a single determination, but these are two separate determinations, and each must be reviewed independently. *See Petersen v. Rogers*, 337 N.C. 397, 403–04, 445 S.E.2d 901, 905 (1994) ("We hold that absent a finding that parents (i) are unfit *or* (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail." (citation omitted (emphasis added))).

¶ 33 The first sentence of Finding of Fact #34 is actually a conclusion of law. Our standard of review is not controlled by the label assigned by the trial court but by the substance of the determination:

> As a general rule, "[t]he labels 'findings of fact' and 'conclusions of law' employed by the lower tribunal in a written order do not determine the nature of our standard of review." Thus, "[i]f the lower tribunal labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' as a conclusion *de novo*."

*In re V.M.*, ___ N.C. App. ___, ___, 848 S.E.2d 530, 534 (2020) (alterations in original) (citation omitted).

¶ 34 Prior cases have often not been clear on whether the determination of unfitness or acting inconsistently with a constitutionally protected right is a conclusion of law

or a finding of fact. But however characterized, prior cases have stated the determination must be based upon clear and convincing evidence, and it has been reviewed de novo. *Id.* at ___, 848 S.E.2d at 534. In 1996, as to unfitness of a parent, in *Raynor v. Odom*, 124 N.C. App. 724, 478 S.E.2d 655 (1996), this Court stated:

> No decisions in North Carolina have defined precisely what findings are necessary for the trial court to conclude that a natural parent is unfit. Although *In re Poole*, 8 N.C. App. 25, 28, 173 S.E.2d 545, 548 (1970) was prior to *Peterson* [sic], the *Poole* Court found that the natural mother should not be denied custody of her child where the only change of condition shown was that the mother had been adjudged in contempt for violating an order of the court. The order there had provided that she not associate with a certain individual, but failed to find that continued association with that individual was immoral or detrimental to the child. *Poole*, 8 N.C. App. at 28, 173 S.E.2d at 548.
>
> Although no decisions have established the standard of review for the legal conclusion that a parent is unfit under *Peterson* [sic], a finding of unfitness should be reviewed de novo on appeal by examining the totality of the circumstances.

*Id.* at 731, 478 S.E.2d at 659 (citations omitted). In a similar manner, this Court reviews the conclusion of whether a parent has acted inconsistently with her constitutionally protected rights de novo and to "determine whether it is supported by 'clear and convincing evidence.'" *Boseman*, 364 N.C. at 549, 704 S.E.2d at 502 (citation omitted).

As noted above, our Supreme Court in *Petersen v. Rogers*, 337 N.C. at 403, 445

S.E.2d at 905, held that "absent a finding that the natural parents (i) are unfit *or* (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care and control of their children must prevail." *Raynor*, 124 N.C. App. at 731, 478 S.E.2d at 659 (emphasis in original). Fitness and whether a parent acted inconsistently with her constitutionally protected right present two separate issues, and we will review each one separately. *See id.*

### A. Preservation of Issue for Review

Initially, we note that both DSS and the GAL argue that by not lodging an objection at the hearing to the trial court's determination that she acted in a manner inconsistent with her protected status, despite having advance notice and the opportunity to object, Mother waived this argument on appeal. DSS argues specifically:

> respondent mother made no objection or argument against the trial court finding she was unfit or had acted in a manner inconsistent with her constitutionally protected status. Respondent mother had the opportunity to make an argument to the trial court and failed to address the required finding that she was unfit or had acted in a manner inconsistent with her protected status. . . . [N]o mention or objection was made at trial by respondent mother to the court making this finding. As such, respondent mother has waived her right to make any such argument on appeal.

At the hearing, Mother presented evidence and specifically argued against granting guardianship of the children to Grandmother. She argued the trial court

should not adopt DSS's recommendations of guardianship but should continue

working on reunification and should allow a trial home placement with Mother. The

trial court did not announce any findings of fact or conclusions of law and did not

make a detailed rendition of its order from the bench but indicated only the general

outline of the ruling. The details of the ruling are contained in the written order,

filed about three months after completion of the hearing.

¶ 38          Rule 10(a)(1) of the Rules of Appellate Procedure addresses preservation of

issues during a trial.

> In order to preserve an issue for appellate review, a party
> must have presented to the trial court a timely request,
> objection, or motion, stating the specific grounds for the
> ruling the party desired the court to make if the specific
> grounds were not apparent from the context. It is also
> necessary for the complaining party to obtain a ruling upon
> the party's request, objection, or motion.

N.C. R. App. P. 10(a)(1). Prior cases have held that a parent may fail to preserve the

constitutional issue of whether the parent has acted inconsistently with her

constitutionally protected rights as a parent by failing to raise the issue before the

trial court because "'[c]onstitutional issues not raised and passed upon at trial will

not be considered for the first time on appeal.'" *In re T.P.*, 217 N.C. App. 181, 186,

718 S.E.2d 716, 719 (2011) (quoting *State v. Lloyd*, 354 N.C. 76, 86–87, 552 S.E.2d

596, 607 (2001)) (alteration in original). In this case, the trial court found Mother

acted in a manner inconsistent with her protected status and that it was required to

address the best interest of the children, and Mother did not raise an objection at trial.

¶ 39        Yet this Court must review the record to determine if the parent had the opportunity to raise this issue or to object to the trial court's ruling before we may find a parent has waived review:

> However, for waiver to occur the parent must have been afforded the opportunity to object or raise the issue at the hearing. Here, although counsel had ample notice that guardianship with Chris was being recommended, Respondent-mother never argued to the court or otherwise raised the issue that guardianship would be an inappropriate disposition on a constitutional basis. We conclude Respondent-mother waived appellate review of this issue.

*In re C.P.*, 258 N.C. App. 241, 246, 812 S.E.2d 188, 192 (2018) (citation omitted).

¶ 40        DSS does not cite any authority for the proposition that a party may "object" at trial *to a trial court's findings of fact* or conclusions of law, nor does it suggest how a party may "object" during the hearing to a trial court's conclusion of law contained only in the written order entered months after completion of the hearing. At trial, a parent may present evidence and may object to evidence presented against her. As to legal issues, a parent may make arguments seeking to convince the trial court to make the conclusions and decree the parent desires and opposing those recommended by DSS or the GAL. A parent may argue that the trial court should not adopt the recommendations of DSS or the GAL, as Mother did. A parent may object to the

introduction of *evidence*, and if she fails to object, she has waived any argument regarding that evidence on appeal. *See In re A.B.*, ___ N.C. App. ___, ___, 844 S.E.2d 368, 370–71 (2020). But a trial court's findings of fact are not evidence, and a parent may not "object" to a trial court's rendition of an order or findings of fact, even if these are announced in open court at the conclusion of a hearing. If a party has presented evidence and arguments in support of her position at trial, has requested that the trial court make a ruling in her favor, and has obtained a ruling from the trial court, she has complied with the requirements of Rule 10 and she may challenge that issue on appeal. An appeal is the procedure for "objecting" to the trial court's findings of fact and conclusions of law.

¶ 41       Here, at the hearing, Mother had notice of the recommendation of guardianship, so she had the "opportunity to object or raise the issue at the hearing." *In re C.P.*, 258 N.C. App. at 246, 812 S.E.2d at 192 (citation omitted). Mother took advantage of this opportunity to raise the issue by presenting evidence and specifically "asking the Court not to adopt [DSS's] recommendations and grant custody to [Grandmother], but . . . to leave reunification the plan and allow [Mother] to begin a trial home placement with the girls," contending that when she left Grandmother's home in 2015 "due to an abusive environment," "she did wait until she felt she had a stable environment . . . to make a stand and try to be reunified with [her] girls" and, further, that "she hit the ground running and has completed all the

objectives on her case plan." Thus, Mother presented evidence regarding her ability to care for the children, opposed the recommendation of guardianship, and requested that the trial court reject the recommendation of guardianship and allow a trial home placement. Although the trial court made findings of fact or conclusions of law in the written order entered several months after the conclusion of the hearing, Mother had no opportunity to "object" to those findings or rulings during the hearing, as argued by DSS, nor is such an objection proper, other than by presenting the argument on appeal. Mother preserved this issue for appellate review by her evidence, arguments, and opposition to guardianship at the trial.

**B. Analysis**

¶ 42    Cases addressing loss of custody by a parent to a nonparent may be based upon unfitness of the parent or actions inconsistent with constitutionally protected parental rights. Although in some cases, the parent's actions inconsistent with parental rights may include abuse or neglect and the parent may be also "unfit" as a parent for the same reasons, not all cases include both elements. Even where there is no question of a parent's fitness, a parent may act inconsistently with her parental rights by voluntarily ceding her parental rights to a third party. A "period of voluntary nonparent custody," where a parent voluntarily allows her children to reside with a nonparent and allows the nonparent to support the children and make decisions regarding the children's care and education presents this type of issue. The

Supreme Court has explained:

> A natural parent's constitutionally protected paramount
> interest in the companionship, custody, care, and control of
> his or her child is a counterpart of the parental
> responsibilities the parent has assumed and is based on a
> presumption that he or she will act in the best interest of
> the child. Therefore, the parent may no longer enjoy a
> paramount status if his or her conduct is inconsistent with
> this presumption or if he or she fails to shoulder the
> responsibilities that are attendant to rearing a child. If a
> natural parent's conduct has not been inconsistent with his
> or her constitutionally protected status, application of the
> "best interest of the child" standard in a custody dispute
> with a nonparent would offend the Due Process Clause.
> However, conduct inconsistent with the parent's protected
> status, which need not rise to the statutory level
> warranting termination of parental rights, *see* N.C.G.S. §
> 7A–289.32 (1995), would result in application of the "best
> interest of the child" test without offending the Due Process
> Clause. Unfitness, neglect, and abandonment clearly
> constitute conduct inconsistent with the protected status
> parents may enjoy. *Other types of conduct, which must be
> viewed on a case-by-case basis, can also rise to this level so
> as to be inconsistent with the protected status of natural
> parents. Where such conduct is properly found by the trier
> of fact, based on evidence in the record, custody should be
> determined by the "best interest of the child" test mandated
> by statute.*

*Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534–35 (1997) (citations omitted)

(emphasis added). In certain circumstances, a parent may cede her constitutionally

protected status to another by leaving her child in that person's care:

> [T]he legal right of a parent to custody may yield to the
> interests of the child where the "parent has voluntarily
> permitted the child to remain continuously in the custody

of others in their home, and has taken little interest in [the child], thereby substituting such others in his own place, so that they stand *in loco parentis* to the child, and continuing this condition of affairs for so long a time that the love and affection of the child and the foster parents have become mutually engaged, to the extent that a severance of this relationship would tear the heart of the child, and mar his happiness[.]"

*Id.* at 75, 484 S.E.2d at 532 (quoting *In re Gibbons*, 247 N.C. 273, 280, 101 S.E.2d 16, 21–22 (1957)). A "'failure to maintain personal contact with the child or failure to resume custody when able' could amount to conduct inconsistent with the protected parental interests[.]" *Owenby,* 357 N.C. at 146, 579 S.E.2d at 267 (citation omitted). The pivotal question, therefore, is "[d]id the legal parent act inconsistently with her fundamental right to custody, care, and control of her child and her right to make decisions concerning the care, custody, and control of that child?" *Mason v. Dwinnell*, 190 N.C. App. 209, 222, 660 S.E.2d 58, 67 (2008). And, "in answering this question, it is appropriate to consider the legal parent's intentions regarding the relationship between his or her child and the third party during the time that relationship was being formed and perpetuated." *Estroff v. Chatterjee*, 190 N.C. App. 61, 69, 660 S.E.2d 73, 78 (2008).

¶ 43        Mother has not challenged most of the trial court's findings as unsupported by the evidence, so they are binding on appeal. *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) ("Findings of fact not challenged by respondent are deemed

supported by competent evidence and are binding on appeal." (citation omitted)).

Most of the findings Mother addresses on appeal are more appropriately considered

as conclusions of law, and we will address them accordingly. *See In re Estate of*

*Sharpe*, 258 N.C. App. 601, 605, 814 S.E.2d 595, 598 (2018) ("If the lower tribunal

labels as a finding of fact what is in substance a conclusion of law, we review that

'finding' as a conclusion *de novo*." (citation omitted)). Our summary of facts noted

above is based upon those unchallenged findings of fact. As directly relevant to

Mother's arguments on appeal, the trial court made the following pertinent findings

of fact:

> 13. [Brittany] and [Brianna] have been placed with their paternal grandmother, [Grandmother], since June 14, 2018 (now 19 months). Both children have actually resided in [Grandmother's] home since birth – prior to June 14, 2018 either both or one of their parents also resided in the home. The mother and father resided in the home together with the children until September 2015 when the mother left (the parents separated).
>
> 14. After September 2015 the mother would visit the children on holidays, birthdays but did not take the children overnight.
>
> 15. [Brittany] is in the 3rd grade at Jonesville Elementary School. [Brittany] is in counseling with Amber Dillard through Jodi Province Counseling. She has been vocal that she would like to continue living with her grandmother. She has had adjustment issues upon return from weekend visitation with her mother and step-father.
>
> 16. [Brianna] is in kindergarten at Jonesville Elementary

School. [Brianna] is also in counseling with Amber Dillard and is vocal she wants to continue living with her grandmother. [Brianna] has also had adjustment issues upon return from weekend visitation with her mother and step-father.

. . . .

22. That [DSS] has made efforts for each of the concurrent plans to timely achieve permanence for the children and prevent placement in foster care. The reunification efforts to finalize permanency are as follows:

·Collateral contacts (children's therapist, school officials);
·Contact with the mother and step-father;
·Contact with the father;
·Medical and dental appointments;
·Referral for father to attend parenting classes;
·Referral for father to have psychological assessment;
·Referral for father to have substance abuse assessment;
·Supervised visitation with father;
·Unsupervised visitation with mother and step-father;
·Referral for [Brittany and Brianna] to have therapy;
·Transportation;
·Child and family team meetings;
·Maintained contact with the children and placement provider;
·Permanency planning review team meeting.

. . . .

24. The Court finds requiring the children to live with the mother and step-father is not in their best interest and is contrary to their health, safety and welfare. Therefore it is not possible for the children to be reunified to the mother's home immediately or within the next six months.

. . . .

28. When the mother left [Grandmother's] home in September 2015 she was scared. She did not take the children with her because of being frightened and because she did not have a stable home to provide the children. The mother married [Stepfather] is [sic] 2016. She has not had a stable home that was large enough for the girls until recently.

. . . .

30. At this time reunification efforts clearly would be unsuccessful and/or would be inconsistent with [Brittany] and [Brianna's] health or safety and need for a safe, permanent home within a reasonable period of time.

31. Both [Brittany] and [Brianna] want to live with their paternal grandmother and visit their parents.

. . . .

34. . . . . [Brittany] and [Brianna] have been in non-secure custody for 19 months. The mother has completed her family service case plan but the children have, since birth, resided in the home of [Grandmother] and wish to remain there. The mother has not resided with the girls for now five years. The father is incarcerated again and has not completed a family services agreement.

35. The Court finds as a fact that the best permanent plan for the children, [Brittany and Brianna] within a reasonable period of time is guardianship.

. . . .

39. [Grandmother] has provided all care for the children for much of their lives and especially the past 19 months.

> [Grandmother] understands the legal significance of caring for the children until they reach 18 years of age.
>
> . . . .
>
> 43. Having considered possible placement with a relative, the best interest of the minor children, [Brittany and Brianna] would be served by awarding guardianship to [Grandmother].

¶ 44          Here, the trial court's unchallenged findings note that Brittany and Brianna resided with Grandmother since their birth, years prior to involvement by DSS. Without notice, Mother left Grandmother's home in 2015, leaving both children with Grandmother and Father. After Father was incarcerated, Grandmother and the children moved in with Great Grandmother, and Grandmother began working the night shift at her job so she could tend to the day-to-day care of the children. Although Mother testified that she moved into a stable residence in 2017 at Stepfather's mother's house, she made no effort to change the children's living arrangement until DSS got involved in 2018. After moving in with Stepfather, Mother rarely called the children or inquired about seeing them. Indeed, even before DSS's involvement in the case, Mother only picked up and visited with her children on holidays and birthdays "but always brought them home afterward" and never had the children spend the night. During this time, although Mother did not pay Grandmother child support, she claimed the children as dependents on her tax returns. Grandmother and Great Grandmother made essentially all parental decisions for the children and

provided financial support for both children since birth.

¶ 45        Our dissenting colleague would not consider the time Mother left the children in the care of Grandmother about three years prior to DSS's involvement for the purposes of determining whether she had acted in a manner inconsistent with her constitutionally protected rights as a parent but instead would consider only the time since July 2018, when Mother signed the OHFSA. But DSS had to become involved when Father was arrested because Mother had already left their home three years earlier. In addition, the trial court's findings show that Mother had little involvement with the children during those three years. She not only ceased to live in the home with the children; she also ceded her parental role. The trial court properly considered Mother's absence from the home and her lack of involvement with the children for the three years prior to Father's arrest to support its conclusion that Mother had acted inconsistently with her constitutionally protected rights.

¶ 46        Mother chose to forgo her constitutionally protected rights when she left her daughters in the care of Grandmother for an indefinite period with no express or implied intention that the arrangement was temporary. *See Boseman,* 364 N.C. at 552, 704 S.E.2d at 504 ("[I]f a parent cedes paramount decision-making authority, then, so long as he or she creates no expectation that the arrangement is for only a temporary period, that parent has acted inconsistently with his or her paramount parental status." (citation omitted)). In other words, Mother "created the existing

family unit that includes [Grandmother] and the child[ren], but not herself." *Price,* 346 N.C. at 83, 484 S.E.2d at 537 (1997). We hold the trial court's conclusion that Mother acted in a manner inconsistent with her constitutionally protected status was supported by the findings of fact, considering the totality of the circumstances. *Adams v. Tessener*, 354 N.C. 57, 66, 550 S.E.2d 499, 505 (2001) ("The trial court's findings of fact are sufficient, when viewed cumulatively, to support its conclusion that [the father's] conduct was inconsistent with his protected interest in the child.").

## V. Unfitness as a Parent

As noted above, the trial court's conclusion of Mother's unfitness as a parent is a separate legal conclusion which requires a separate analysis. In Finding of Fact #34, the trial court also determined that Mother was unfit. As noted above, the determination of unfitness of a parent is a conclusion of law, so we must review this conclusion to determine if it is supported by the findings of fact. *See Raynor*, 124 N.C. App. at 731, 478 S.E.2d at 659 ("[T]he legal conclusion that a parent is unfit under *Peterson* [sic], a finding of unfitness should be reviewed de novo on appeal by examining the totality of the circumstances." (citation omitted)).

Many of the findings of fact regarding Mother address her compliance with most of the requirements of the OHFSA. She "completed parenting classes and a Domestic Violence and Anger Management Assessment," with "no recommendations for further services." She had submitted to random drug screens and all were

negative. She had exercised "unsupervised visitation including overnight and weekend visitation" and moved to a home "that allows the children to have a bedroom." She had "participated with the service plan" and "made adequate progress within a reasonable period of time." She attended court hearings and stayed in contact with the GAL. The other substantive findings of fact, as quoted above, address Mother's leaving the children with Grandmother in 2015 and her failure to provide any financial support or consistent parental care for the children after she left, allowing Grandmother to take on the primary parental responsibilities for the children. Thus, although we have already determined that Mother had voluntarily ceded her primary parental role to Grandmother years before DSS's involvement, the trial court's findings of fact do not support a conclusion that Mother is unfit. We reverse the portion of the permanency planning order concluding that Mother was unfit as a parent. However, because the trial court's determination that Mother acted in a manner inconsistent with her constitutionally protected status was supported by the findings of fact, the trial court did not err in its grant of guardianship to Grandmother. *See Bennett v. Hawks*, 170 N.C. App. 426, 429, 613 S.E.2d 40, 42 (2005) ("Therefore, where the trial court finds that a parent is fit to have custody, it does not preclude the trial court from granting joint or paramount custody to a nonparent where the trial court finds that the parent's conduct was inconsistent with her constitutionally protected status." (citation omitted)).

## VI.     "Best Interest of the Child" Standard

Mother contends "[b]ecause the trial court's finding that [Mother] is unfit to provide for her daughter's [sic] needs and has acted in a manner inconsistent with her constitutionally-protected status as a parent is not supported by clear and convincing evidence, the trial court erred when it applied a best interest standard." Because the trial court concluded that Mother had acted inconsistently with her constitutionally protected rights as a parent, as discussed above, we hold the trial court did not err in its application of the best interest standard. *Owenby*, 357 N.C. at 146, 579 S.E.2d at 267.

## VII.     Conclusions of Law

Mother contends that several of the trial court's conclusions of law are not supported by adequate findings of fact and are based on a misapplication of the law. We first note Mother's argument regarding misapplication of the law is based upon her contention the trial court erred concluding that she had acted inconsistently with her constitutionally protected rights as a parent. As we have already addressed this issue and determined the trial court did not err in its conclusion, we will not address this issue again. Thus, we will consider only whether the conclusions of law are supported by the findings of fact.

The trial court made these pertinent conclusions of law:

> 2. Placement of the children, [Brittany and Brianna], to the

mother or father's home at this time is contrary to their health, safety, welfare and best interest. Conditions that led to custody of the children by [DSS] and removal from the home of the parent(s) continue(s) to exist.

. . . .

4. That after considering priority placement of the minor child with a relative who is willing and able to provide proper care and supervision in a "safe home," the best interest of the minor children, [Brittany and Brianna], would be served by awarding guardianship to [Grandmother].

Mother argues these conclusions of law are not supported by adequate findings of fact based upon her compliance with her plan, DSS's recommendation for a trial home placement, and the trial court's approval of unsupervised visitation. But as discussed above, Findings of Fact #24 and #30 are supported by competent evidence and support the conclusion that placement in Mother's home would be contrary to Brittany and Brianna's health, safety, welfare, and best interest. Mother also argues, in one sentence, based solely on the fact that she and her husband had completed their case plan, the portion of Conclusion of Law #2 that the "[c]onditions that led to custody of the children by [DSS] and removal from the home of the parent(s) continue(s) to exist" was not supported by competent evidence. But Mother's success in her case plan does not automatically lead to a conclusion that the conditions which led to removal do not continue to exist.

The removal of the children from the home occurred in 2018 and was necessary

based on the 1 May 2018 incident when Father was intoxicated and began throwing and smashing plates *and* Mother's absence as a caretaker for the children. When Father was arrested, there was no parent available to care for the children. Mother had already left the home in 2015, and she did not have a suitable residence for the children at that time. Thus, Mother is correct that the immediate impetus for removal of the children from the home where they had resided since birth—Father's intoxication and violence in the home—did not continue to exist, as Father was removed from the home when he was arrested and incarcerated.[5] And as of 30 January 2020, because of Father's incarceration, he remained unavailable to care for the children. But the other condition leading to DSS's custody of the children and removal from the home where Father, the children, and Grandmother lived was Mother's absence and lack of a suitable home. Mother had left the home in 2015. After she left, she "occasionally" visited with her daughters but had not participated in any decision making, contributed financially towards their care, or "otherwise filled the role of parent/caretaker." In 2018, Mother lived in Alexander County with Stepfather who "ha[d] an extensive criminal history" and suspected issues with alcohol abuse. Mother is correct that by the time of the permanency planning hearing, her circumstances had changed in many ways, but the trial court's

---

[5] Father did not appeal from the trial court's order, so we have not addressed the trial court's findings or conclusions regarding Father.

conclusions were supported by the findings of fact, so this argument is overruled.

¶ 54        Mother also challenges Conclusion of Law #3, which provides:

> [DSS] has made reasonable efforts to finalize the permanent plan to timely achieve permanence for the children and prevent placement in foster care, reunify this family, and implement a permanent plan for the children. Foster placement has been avoided by placement with [Grandmother].

Mother does not challenge this conclusion as unsupported by the findings of fact, but

her entire argument is as follows:

> N.C. Gen. Stat. § 7B-906.2(c) requires a trial court, for each subsequent permanency planning hearing, to make [a] written finding about the efforts a department of social services made toward both the primary and secondary permanent plans in effect prior to the hearing, and to make a conclusion about whether efforts to finalize such permanent plans were reasonable. The primary and secondary permanent plans in effect prior to the 30 January 2020 hearing were reunification and guardianship, pursuant to the trial court's permanency planning order entered on 6 November 2019. Given that [Mother] mostly completed her case plan before [DSS] abruptly moved the court to award guardianship to the paternal grandmother, the trial court erred when it concluded that [DSS's] efforts to finalize the permanent plan of reunification were reasonable.

As discussed above, we have already determined Finding of Fact #30 was supported

by the evidence.

> 30.   At this time reunification efforts clearly would be unsuccessful and/or would be inconsistent with [Brianna and Brittany's] health or safety and need for a safe,

permanent home within a reasonable period of time.

In addition, Conclusion of Law #3 is supported by Finding of Fact #22 and because Finding of Fact #22 is not challenged by Mother, it is "deemed supported by competent evidence and [is] binding on appeal." *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58 (citation omitted).

Mother does not argue the trial court failed to address the factors and findings as required by N.C. Gen. Stat. § 7B-901(c) but argues only that the trial court made an "abrupt" change to the plan, even though she was making some progress. Mother cites no authority regarding the timing or "abruptness" of a change in the plan to achieve permanence, and as long as the trial court considers the factors as required by N.C. Gen. Stat. § 7B-901(c) and makes the appropriate findings, we can find no abuse of discretion by the trial court's decision to change to guardianship.

## VIII. Conclusion

Although the trial court's conclusion that Mother was unfit was not supported by the findings of fact, its conclusion that Mother acted in a manner inconsistent with her constitutionally protected status was supported by the findings of fact, based upon clear and convincing evidence, making the "best interest of the child" standard applicable. Additionally, competent evidence supported the trial court's findings of fact and those findings supported the challenged conclusions of law.

AFFIRMED IN PART; REVERSED IN PART.

Judge DIETZ concurs with separate opinion.

Judge CARPENTER concurs in part and dissents in part with separate opinion.

DIETZ, Judge, concurring.

I concur in the judgment but note that this Court could benefit from the guidance of our Supreme Court concerning when and how the constitutional issue of whether parents have acted inconsistently with their constitutionally protected rights must be raised and preserved in the trial court. It is hard to square this case with *In re C.P.*, 258 N.C. App. 241, 246, 812 S.E.2d 188, 192 (2018), and the resulting conflict between this case and *In re C.P.* is likely to lead to confusion among litigants and future panels of this Court.

CARPENTER, Judge, concurring in part and dissenting in part.

The majority's opinion holds: (1) the trial court's findings of fact are supported by competent evidence; (2) the trial court's factual findings support its conclusions of law; (3) the trial court's findings of fact do not support a conclusion that Respondent Mother is unfit; and (4) Respondent Mother acted in a manner inconsistent with her constitutionally protected status, making the "best interest" analysis applicable. I disagree and respectfully dissent in part.

I agree that the trial court's findings of fact are supported by competent evidence; however, I disagree with the majority's conclusion that the trial court's findings of fact support the conclusions of law. Specifically, I do not agree that Conclusion of Law 2 is supported by adequate factual findings. Conclusion of Law 2 states:

> 2. Placement of the children, [Brittany and Brianna], to the mother or father's home at this time is contrary to their health, safety, welfare, and best interest. Conditions that led to custody of the children by YCHSA and removal from the home of the parent(s) continue[ ] to exist.

The trial court made the following pertinent findings of fact:

> 4. The mother and her husband have completed parenting classes and a Domestic Violence and Anger Management Assessment. The assessment had no recommendations for further services.
> 5. The mother has submitted to random drug screens; all have been negative for substances.
> 6. The mother and step-father have had unsupervised visitation including overnight and weekend

visitation (every Friday – Monday morning). They have moved to a home that allows the children to have a bedroom.

7. The mother had participated with the services plan and has made adequate progress within a reasonable period of time. She has generally attended court hearings and has stayed in contact with the agency and the GAL Program.

. . . .

15. Brittany has had adjustment issues upon return from weekend visitation with her mother and step-father.

16. Brianna has also had adjustment issues upon return from weekend visitation with her mother and step-father.

. . . .

23. Although the mother and step-father have completed their family service agreement and have a bond with the children, the strongest bond is with the paternal grandmother. Ms. Williams' home is where the children want to live. The children want to continue to visit with their mother and step-father.

24. The Court finds requiring the children to live with the mother and step-father is not in their best interest and is contrary to their health, safety and welfare. Therefore, it is not possible for the children to be reunified to the mother's home immediately or within the next six months.

¶ 61      First, I note the initial sentence of Finding of Fact 24 is a conclusion of law: "The Court finds requiring the children to live with the mother and step-father is not in their best interest and is contrary to their health, safety and welfare."

¶ 62      As our Court has held, when a "finding of fact is essentially a conclusion law, . . . it will be treated as a conclusion of law . . . ." *Stan D. Bowles Distrib. Co. v. Pabst*

*Brewing Co.*, 69 N.C. App. 341, 344, 317 S.E.2d 684, 686 (1984) (citation omitted). Therefore, I review Finding of Fact 24 as a conclusion of law. Upon review, I do not find adequate factual findings in the Permanency Plan Review Order (the "Order") to support such a conclusion. The majority, in reviewing Finding of Fact 24, relies on Respondent Mother's delay in finding adequate housing per the Out of Home Family Services Agreement ("OHFSA") as sufficient competent evidence to support the finding. However, the trial court made no findings with respect to Respondent Mother's delay in obtaining housing. On the contrary, in Finding of Fact 7 the trial court found, *inter alia,* Respondent Mother "has participated with the service plan and has made adequate progress within a reasonable period of time." As the majority notes, adequate housing for the children was ultimately obtained before the 30 January 2020 permanency planning hearing. For the foregoing reasons, I would hold the trial court failed to make sufficient factual findings to support the conclusion that it is not in the best interest of the minor children to live with Respondent Mother and doing so would be contrary to the children's health, safety, and welfare.

¶ 63        Similarly, a review of the remaining factual findings reveals there are not adequate findings to support Conclusion of Law 2, which stated that "[p]lacement of the [minor children] to the mother['s] . . . home at this time is contrary to their health safety, welfare and best interest. Conditions that led to custody of the children by YCHSA and removal from the home of the parent(s) continue[ ] to exist." Although

there may have been evidence in the record to support Conclusion of Law 2, there were insufficient findings to support such a conclusion in the Order before the Court.

As an initial concern, I note the children were never removed from Respondent Mother's home; therefore, it was inaccurate for the trial court to conclude, as it did in Conclusion of Law 2, that the conditions that led to the children's removal from the *parents'* home continue to exist. In fact, it was the paternal grandmother's home, the home to which the court ordered the children to return when it awarded guardianship to the parental grandmother in the Order, from which the children were removed. Nevertheless, the court found Respondent Mother's home "contrary to [the children's] health, safety and welfare" and the paternal grandmother's home to be safe and in the children's best interest.

Further, Finding of Fact 23, stating that Respondent Mother has "completed [her] family service agreement" is inconsistent with Conclusion of Law 2 that states, *inter alia,* "[c]onditions that led to custody of the children by YCHSA and removal from the home of the parent(s) continue[ ] to exist." *See In re A.S.*, ___ N.C. App. ___, ____, 853 S.E.2d 908, 914 (2020) (vacating an order concluding the mother was unfit and had acted inconsistently with her constitutionally protected status, and eliminating reunification efforts where the trial court found the mother had not alleviated the conditions leading to the removal of her minor children for lack of support of competent evidence because that finding of fact was inconsistent with a

finding of fact, which stated the mother was in compliance with her case plan). Additionally, if Respondent Mother had completed her family service agreement and was presumably in compliance with the agreement, including housing requirements, then the conditions that led to the children's removal from their parents' home would surely have been eliminated in Respondent Mother's home. Because there are not sufficient factual findings to show that Respondent Mother was "acting in a manner inconsistent with the health or safety of the juvenile," I would hold the trial court erred in ceasing reunification efforts. *See* N.C. Gen. Stat. § 7B-906.2(d)(4) (2019).

¶ 66 Next, I disagree with the majority's conclusion that Respondent Mother lost "her constitutionally protected rights when she left her daughters in the care of [the paternal grandmother] for an indefinite period with no express or implied intention that the arrangement was temporary."

¶ 67 The trial court made the following pertinent findings of fact:

> 13. [Brittany and Brianna] have been placed with their paternal grandmother . . . since June 14, 2018 (now 19 months). Both children have actually resided in Ms. Williams' home since birth—prior to June 14, 2018 either both or one of their parents also resided in the home. The mother and father resided in the home together with the children until September 2015 when the mother left (the parents separated)
> 14. After September 2015 the mother would visit the children on holiday, birthdays but did not take the children overnight.
> . . . .
> 28. When the mother left the [family] home in

> September 2015, she was scared. She did not take the children with her because of being frightened and because she did not have a stable home to provide the children. The mother married [step-father in] 2016. She has not had a stable home that was large enough for the girls until recently.
>
> . . . .
>
> 30. At this time reunification efforts clearly would be unsuccessful and/or would be inconsistent with [Brittany] and [Brianna's] health or safety and need for a safe, permanent home within a reasonable period of time.
>
> 31. The Court finds the mother and father by clear and convincing evidence are unfit to provide for [Brittany] and [Brianna's] needs and have acted in a manner inconsistent with their constitutionally protected status as a parent. [Brittany] and [Brianna] have been in non-secure custody for 19 months. The mother has completed her family service case plan but the children have, since birth, resided in the home of [Grandmother] and wish to remain there. The mother has not resided with the girls for now five years. The father is incarcerated again and has not completed a family services agreement.

Here, the record reveals Respondent Mother did indeed leave the father's home in 2015 while the minor children remained in the grandmother's and father's care. However, the record also reveals Respondent Mother signed and completed an OHFSA on 13 July 2018, with which she made reasonable progress throughout the course of the plan. With the exception of the housing requirement, which was fulfilled right before the 30 January 2020 hearing, Respondent Mother had substantially

complied with the terms and conditions of the OHFSA before the permanency planning hearing.

¶ 69        The majority concludes the facts that Respondent Mother left the marital home—in which the parent grandmother also resided—in 2015 and that Respondent Mother "visit[ed] the children on holidays [and] birthdays" are sufficient findings for the trial court to conclude she had acted in a manner inconsistent with her constitutionally protected status as a parent. However, as with Conclusion of Law 2, there are insufficient findings to support the conclusion that Respondent-Mother acted in a manner inconsistent with her constitutionally protected status. Although there may have been clear and convincing evidence in the record that Respondent-Mother acted inconsistently with her constitutionally protected status, the trial court's findings of fact were inadequate to support such a conclusion. *See Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) ("[A] trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be clear and convincing evidence."); *In re D.A.*, 258 N.C. App. 247, 252, 811 S.E.2d 729, 733 (2018) ("Absent clear findings, based upon clear, cogent, and convincing evidence, demonstrating how [the respondent parent] acted inconsistently with his [or her] constitutionally protected status," it is error for the trial court to award permanent custody of a minor child to a third party.).

¶ 70        Additionally, the trial court repeatedly found that a primary plan remained for

reunification. Similarly, DSS's recommended permanent plan was for reunification. Based on Respondent Mother's case plan and her level of compliance as of 19 August 2019, DSS recommended in its report "to start a trial home placement" with Respondent Mother. Pursuant to N.C. Gen. Stat. § 7B-906.2:

> [r]eunification shall be a primary or secondary plan unless the court made findings under [N.C. Gen. Stat. §] 7B-901(c) or [N.C. Gen. Stat. §] 7B-906.1(d)(3), the permanent plan is or has been achieved in accordance with subsections (a1) of this section, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

N.C. Gen. Stat. § 7B-906.2(b) (2019). As discussed above, the trial court failed to make findings of fact that reunification would be inconsistent with the children's health and safety. *See id.* Moreover, the record reveals Respondent Mother substantially complied with her case plan, including the housing requirement, by the 30 January 2020 permanency planning hearing. To ignore compliance with a case plan would serve to discourage parents who, like Respondent Mother, comply with DSS's requirements and recommendations and seek reunification with their children. Moreover, it will assuredly be detrimental to the success of this DSS program and similar programs.

¶ 71 For the foregoing reasons, I would hold: (1) the trial court's findings of fact are supported by competent evidence; (2) the trial court's conclusions of law are not supported by adequate findings of fact; and (3) the trial court made insufficient

findings to support the conclusions that Respondent Mother was unfit or had acted in a manner inconsistent with her constitutionally protected status; thus, the "best interest" standard was inapplicable. I would vacate the Order and remand to the trial court for further proceedings. I respectfully dissent.